1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Matthew S. Weiler (SBN 236052)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
MWeiler@schneiderwallace.com

*Attorney for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW RAGONE, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>    v.<br><br>TESLA, INC.,<br><br>         Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY DEMAND** |

CLASS ACTION COMPLAINT

Plaintiff Andrew Ragone ("Plaintiff"), on behalf of himself and the Class defined below, brings this action against Tesla, Inc. ("Tesla") and alleges, upon his personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel, as follows:

## NATURE OF THE ACTION

1.      This antitrust class action, brought pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Magnuson-Moss Warranty Act, 15 U.S.C .§ 2302, seeks relief for all persons who, like Plaintiff, have been forced to pay supracompetitive prices and suffer exorbitant wait times to maintain and repair their Tesla vehicles as a result of Tesla's monopolization, attempted monopolization, exclusionary conduct, and restraint of the markets for compatible replacement parts ("Tesla-Compatible Parts") and maintenance and repair services ("Tesla Repair Services") for Tesla vehicles.

2.      Historically, consumers of traditional vehicles with internal combustion engines ("ICE Vehicles") have had multiple options for maintaining and repairing their motor vehicles after purchase—they could perform the work themselves, bring their vehicle to a dealership, or bring them to an independent repair shop. Moreover, when having that maintenance or repair, the consumer would have the choice of using original equipment manufacturer ("OEM") or aftermarket replacement parts.

3.      Tesla owners, by comparison, effectively have only one option: schedule service at Tesla (or within the limited network of Tesla-approved service centers), where their Tesla will be maintained or repaired using only Tesla OEM parts.

4.      This is because Tesla, which has market power in the United States electric vehicle market ("EV market"), leverages that power to monopolize and restrain the markets for Tesla Repair Service and Tesla-Compatible Parts. Tesla does this by, among other things:

   (a) Designing its vehicle warranties and related policies to discourage Tesla owners from obtaining parts or services anywhere other than Tesla;

   (b) Designing its vehicles so that maintenance and repairs require access to diagnostic and telematic information accessible only through remote management tools exclusively accessed by Tesla; and

   (c) Limiting access to its manuals, diagnostic tools, vehicle telematic data, and original equipment manufacturer ("OEM") replacement parts.

5.      Tesla then further leverages its market power in Tesla Repair Service market to maintain its monopoly in the Tesla-Compatible Parts market, and vice versa.

6.      As a result of this anticompetitive course of conduct, Tesla has prevented independent providers from entering the Tesla Repair Services market, prevented its OEM parts manufacturers from producing Tesla-Compatible Parts for anyone other than Tesla, and prevented market entry by non-OEM, Tesla-Compatible Parts manufacturers.

7.      This, in turn, has caused Tesla owners to suffer lengthy delays in repairing or maintaining their EVs, only to pay supracompetitive prices for those parts and repairs once they are finally provided.

8.      Tesla's unlawful monopoly of the Tesla Repair Services and Tesla-Compatible Parts markets should be enjoined and dismantled, Tesla should be ordered to make its repair manuals and diagnostic tools available to individuals and independent repair shops at a reasonable cost, and Plaintiff and the proposed Class should be reimbursed by Tesla for the amounts they overpaid for Tesla Repair Services and Tesla Compatible Parts. Accordingly, Plaintiff, on behalf of himself and all others similarly situated, seeks declaratory and injunctive relief, treble damages, costs, and attorneys' fees.

## PARTIES

9.      Plaintiff Andrew Ragone is an adult citizen of the state of Colorado who resides in Jefferson County, Colorado. Plaintiff owns a Tesla Model S and has paid Tesla for Tesla Repair Services and/or Tesla-Compatible Parts during the Class Period (as defined below).

10.     Defendant Tesla is a multinational automotive and clean energy company founded in Palo Alto, California in 2003. By 2014, Tesla had become the largest automotive employer in the State of California.[1] In December 2021, Tesla moved its headquarters to Austin, Texas. However, Tesla maintains manufacturing facilities in Fremont, California, where it produces the Model S, Model 3, Model X, and Model Y[2], and, when announcing the move of its headquarters, told investors that it still planned to increase output in the California plant by 50 percent.[3]

---

[1] *See* https://www.caranddriver.com/news/a15365435/tesla-wins-california-is-now-the-states-largest-auto-employer/ (last accessed 2/9/23).
[2] *See* https://www.tesla.com/manufacturing (last accessed 1/31/23).
[3] *See* https://arstechnica.com/cars/2021/10/tesla-relocates-from-california-sets-up-new-corporate-hq-in-texas/ (last accessed 2/9/23).

11.     To that end, on February 22, 2023, Tesla announced it was taking over Hewlett-Packard's original headquarters to use as Tesla's "global engineering headquarters."[4] At a press conference held with California's Governor that same day, Tesla's CEO Elon Musk described it as "effectively a headquarters of Tesla." [5] He further stated, "We're a California-Texas company," and that it is "kind of a dual-headquartered company."[6]

12.     Using its factories, Tesla manufactures the foundational electric components of its EVs (*e.g.*, electric motors/drive units, battery packs, and chargers), while other components (*e.g.*, ordinary car parts, various EV parts, and raw materials) are purchased from suppliers around the world.[7] Some of the components are acquired from a single source.[8] Moreover, some component suppliers enter into contracts with Tesla that, among other things, provide that all tooling, supplies, and materials used by the supplier to manufacture parts for Tesla are owned by Tesla.

13.     In addition to manufacturing EVs and parts, Tesla, among other things, operates over 150 service centers across the United States.[9]  Forty-four of those service centers are located in California.

## JURISDICTION AND VENUE

14.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 4 of the Clayton Act, 15 U.S.C. § 15, Sections 102(c) and 110(d) of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2302(c) and 2310(d). It is brought on behalf of Plaintiff and a proposed Class of similarly situated individuals numbering more than 100, at least one of whom is a citizen of a state different from the state in which Tesla is domiciled, and with an amount in controversy exceeding $5 million, exclusive of interest and costs.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

16.     This Court has personal jurisdiction over Tesla because it was headquartered in this District for most of the relevant time period, a substantial portion of the EVs it has sold to consumers are

---

[4] *See* https://www.cnbc.com/2023/02/22/elon-musk-meets-with-california-gov-newsom-at-teslas-engineering-hq.html (last accessed 3/3/23).
[5] *Id.*
[6] *Id.*
[7] *See* https://www.investopedia.com/ask/answers/052815/who-are-teslas-tsla-main-suppliers.asp (last accessed 1/31/23).
[8] *See* Tesla Motors, Inc. 2015 Form 10-K at pg. 9.
[9] *See* https://www.tesla.com/findus/list/services/United+States (last accessed 1/31/23).

CLASS ACTION COMPLAINT

located within this District, and it continues to maintain a factory in this District.[10] Thus, the conduct complained of herein caused injury to persons throughout the United States, but particularly within this District, and a substantial portion of the conduct complained of took place in this District.

17.    Venue is proper under 15 U.S.C. §§ 15(a) (Clayton Act) and 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391 (general venue provision). Tesla transacts substantial business within this District, maintains significant operations, including a factory, in this District, and conducts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

## DIVISIONAL ASSIGNMENT

18.    Pursuant to Civil Local Rule 3-2(c) and General Order No. 44, venue for this antitrust action is proper in any courthouse in this District. Given Plaintiff's residence in Sonoma County, Plaintiff requests assignment in the San Francisco/Oakland Division.

## RELEVANT MARKETS

**A.    The EV Market.**

19.    The EV market comprises battery-electric motor vehicles designed and sold to be operated on public streets. While there are numerous methods for getting from point A to point B, people purchase EVs in particular because of their unique attributes, including, among other things, the ability to comfortably transport multiple individuals to specific destinations, located many miles apart, with zero carbon emissions.

20.    While Tesla sometimes states that it competes in the "worldwide automotive market," it also acknowledges that EVs are a separate product market by consistently promoting "the development of the electric vehicle market" and touting its superiority and "attractiveness" compared to the ICE-vehicle market.[11]

21.    That is why, according to one recent American Automobile Association ("AAA") study, 96% of EV owners will *only* buy another EV as their next vehicle.[12] As this study demonstrates, EV

---

[10] *See* https://www.nbcdfw.com/news/local/texas-news/tesla-officially-moves-headquarters-from-california-to-texas/2829343/ (last accessed 1/31/23).

[11] *See, e.g.*, Tesla 2021 Form 10-K at 11-12.

[12] *See* https://www.realsimple.com/work-life/money/money-planning/electric-car-costs (last accessed 1/31/23); https://newsroom.aaa.com/2020/01/aaa-owning-an-electric-vehicle-is-the-cure-for-most-consumer-concerns/?icid=mag_cars (last accessed 1/31/23).

CLASS ACTION COMPLAINT

owners do not consider other types of vehicles, including ICE vehicles, to be reasonable substitutes for EVs.

22.     When analyzing market definition, federal antitrust enforcement agencies use a tool called a "SSNIP test" whereby they examine whether a hypothetical monopolist could impose a small but significant non-transitory increase in price (a "SSNIP"), typically 5%, without causing a sufficient number of customers to switch to other products or services to render the SSNIP unprofitable to the monopolist.

23.     Not only do EVs already cost more than their similarly-equipped, ICE-vehicle counterparts, EV prices have increased at a faster rate.[13] For example, from January to May 2022, EV prices jumped 22% while non-EV motor vehicle prices increased only 14%.[14] Despite the occasional price decrease, Tesla in particular has been able to increase prices over time while steadily increasing overall sales.[15] As noted by one journalist, "Tesla hasn't appeared to have suffered from its price hikes over the years, as the Model 3 was the world's best-selling electric vehicle in 2021, with about 540,000 units sold."[16] Thus, Tesla's ability to increase prices without losing sales supports the conclusion that the EV market is properly defined.

24.     Within the EV market, Tesla has long held the dominant position. For example, during the first half of 2020, registration data showed that Tesla had nearly 80% market share in the United States.[17] While other companies have since increased their EV product offerings, Tesla still controls 65% of the domestic EV market, with Tesla's Model 3, Model Y, Model S, and Model X comprising the first, second, fourth, and sixth best-selling EVs in the United States, respectively.[18]

25.     For these reasons, the United States EV market is its own relevant market, in which Tesla has market power.

---

[13] *See* https://www.cnbc.com/2021/12/29/electric-vehicles-are-becoming-more-affordable-amid-spiking-gas-prices.html (last accessed 1/31/23) (stating that the average EV price is $10,000 higher than average price for all motor vehicles).
[14] *See* https://www.businessinsider.com/electric-vehicle-prices-rise-22-percent-fossil-fuel-14-percent-2022-6 (last accessed 1/31/23).
[15] *See* https://getjerry.com/electric-vehicles/tesla-increased-prices-across-board#not-teslas-first-price-hike (last accessed 1/31/23).
[16] *See* https://www.cnn.com/2022/03/16/cars/tesla-model-3-price-increase/index.html (last accessed 1/31/23).
[17] *See* https://electrek.co/2021/02/16/tesla-owns-electric-car-market-us/ (last accessed 1/31/23).
[18] *See* https://electrek.co/2023/01/09/the-top-10-best-selling-electric-vehicles-in-the-us-of-2022/ (last accessed 1/31/23).

5

**B.     The Tesla Repair Services Market.**

26.     The Tesla Repair Services Market comprises various services to repair and maintain Tesla EVs. Although the proposed Class includes individuals both whose Tesla EVs are still covered under warranty and those whose are not, this case is concerned only with repair and maintenance services that are not covered under warranty.

27.     For example, a Tesla EV owner would be considered a Class member if his Model S is still covered under warranty, but she nonetheless paid for Tesla Repair Services because a particular repair was deemed by Tesla not to be covered under warranty.

28.     There are no viable substitutes for Tesla Repair Services, and they are not interchangeable with services designed for other vehicles. Therefore, while the Tesla Repair Services market is derivative of the EV market, it also comprises its own distinct product market.

29.     Once consumers have purchased a Tesla EV, they are locked into repair and maintenance services specific to their Tesla vehicles. It is difficult, if not impossible, to accurately forecast how much repair and maintenance services will be required and what they will cost prior to purchasing an EV. Compounding this problem, as discussed below, Tesla misleadingly tells consumers that its EVs are specifically designed to require little or no maintenance.[19]

30.     Moreover, the cost of an EV is considerably higher than the cost of an individual maintenance or repair service, so—even ignoring Tesla's monopoly in the EV market—it is not economically feasible for a Tesla EV owner to switch to a different EV in order to avoid the high prices and low supply of Tesla Repair Services.

31.     In addition, new EV entrants—such as Rivian[20] and Lucid Motors[21]—impose similar restraints as Tesla, thus further limiting alternatives for EV purchasers.

32.     Thus, competition in the EV foremarket does not and cannot discipline prices or anticompetitive conduct in the Tesla Repair Services aftermarket.

---

[19] *See* https://www.tesla.com/service (last accessed 2/3/23).
[20] *See* https://assets.rivian.com/2md5qhoeajym/4QCZtanQpDG0oFPAhaskR0/387b5d12f8c8d9f6cf9d9b271c033190/r1t_r1s-new-vehicle-limited-warranty-guide-us-en-us-20221202.pdf (last accessed 2/14/23).
[21] *See* https://lucidmotors.com/media/document/Owner%27s+Manual+-+Lucid+Air-enUS_2022_30_1.pdf (last accessed 2/15/23).

CLASS ACTION COMPLAINT

33.     Absent the anticompetitive conduct alleged herein, the Tesla Repair Services Market should include both services offered by Tesla and services offered by third-party, independent service providers. As history has demonstrated in various other markets, the existence of independent service providers promotes competition and leads not only to more service providers, it also leads to better service and lower prices.

34.     However, due to the anticompetitive course of conduct described in this Complaint, there are an insignificant number of independent service providers from whom Tesla owners may turn to repair or maintain their EVs.

35.     Due to the exclusionary and monopolistic conduct discussed herein, consumers in the Tesla Repair Services Market suffer from lack of choice, long wait times, and supracompetitive prices.

36.     Except for some basic maintenance services (*e.g.*, tire rotation), virtually all Tesla Repair Services are performed by Tesla or its limited network of Tesla-approved facilities.

37.     For these reasons, Tesla has market power in the United States Tesla Repair Services Market.

**C.     The Tesla-Compatible Parts Market.**

38.     The Tesla-Compatible Parts Market comprises the various parts used to repair and maintain Tesla EVs. This case is concerned only with Tesla-Compatible Parts purchased by consumers, not those covered under warranty.

39.     Once consumers have purchased a Tesla EV, they are locked into using Tesla-Compatible Parts specific to their Tesla vehicle when repairing and maintaining their Tesla EVs. It is difficult, if not impossible, to accurately forecast how much money will need to be spent on Tesla-compatible parts over the lifetime of an EV prior to purchase. Compounding this problem here, as discussed below, Tesla misleadingly tells consumers that its EVs have fewer moving parts that could possible need to be replaced.[22]

40.     The cost of an EV is considerably higher than the cost of an individual replacement part, so it is not economically feasible for a Tesla EV owner to switch to a different EV in order to avoid the

---

[22] *See* https://www.tesla.com/service (last accessed 2/3/23).

CLASS ACTION COMPLAINT

high prices and low supply of Tesla-Compatible Parts. Thus, competition in the EV market does not and cannot discipline prices or anticompetitive conduct in the Tesla-Compatible Parts market.

41.     There are no viable substitutes for Tesla-compatible parts, and most parts are not interchangeable with parts designed for use with other manufacturers' vehicles. Therefore, while the Tesla-Compatible Parts market is derivative of the EV market, it also comprises its own distinct product market.

42.     Absent the conduct complained of herein, the Tesla-Compatible Parts market would include not only OEM parts sold by someone other than Tesla, but also non-OEM (*a.k.a.* "aftermarket") parts. Traditionally in other markets, such as the ICE-vehicle market, the wide-availability of OEM parts and the existence of non-OEM aftermarket parts promotes competition and leads to greater supply, quicker service, and lower prices.

43.     However, due to the anticompetitive course of conduct described in this Complaint, there are few if any non-OEM parts manufacturers, meanwhile Tesla limits consumer access to OEM parts.

44.     As a result, consumers in the Tesla-Compatible Parts Market suffer from lack of choice, long wait times, and supracompetitive prices. Except for some basic maintenance-related parts (*e.g.*, tires), virtually all Tesla-Compatible Parts are sold through Tesla and/or Tesla's app.

45.     Accordingly, Tesla also has market power in the United States Tesla-Compatible Parts Market.

**D.     The Relevant Geographic Market.**

46.     The relevant geographic market for each of the product markets discussed above is the United States.

47.     Motor vehicles designed to operate on public streets in the United States must meet stringent regulatory requirements that are specific to this country. Accordingly, certain motor vehicles are designed specifically for the American market, and American consumers generally do not purchase and import motor vehicles designed for use outside the United States.

48.     Similarly, American Tesla owners do not and would not turn to parts manufactured for sale outside the United States due to shipping costs and the fact that, due to differing regulatory

requirements, parts designed for use in foreign markets may not be compatible with parts designed for use in the United States.

49.     Lastly, American Tesla owners do not and would not turn to service providers located outside of the United States when servicing their EVs, as the cost and wait times associated with moving vehicles and parts back and forth between countries would not be economically viable.

**E.     Barriers to Entry.**

50.     Significant barriers to entry exist in the EV, Tesla Repair Services, and Tesla-Compatible Parts markets which enable Tesla to maintain its market power.

51.     As discussed above, all three markets are impacted by complex regulatory and licensing requirements. Moreover, *de novo* entry into any of the EV and Tesla-Compatible Parts markets would require substantial capital investments in manufacturing facilities and creation of a nationwide distribution network.

52.     Most importantly, Tesla's own conduct challenged in this Complaint has created substantial barriers to entry into the Tesla Repair Services and Tesla-Compatible Parts markets. Due to Tesla's anticompetitive and monopolistic practices, a new entrant in either of these markets would effectively be limited to competing for customers who either were no longer under warranty or were willing and able to risk voiding their vehicle warranties. Moreover, they would need to service those customers without reasonable access to the manuals, diagnostic software, telematic data, and replacement parts necessary to properly service and maintain Tesla EVs.

## FACTUAL ALLEGATIONS

**A.     Historical Background: The Right-to-Repair Movement and Guaranteeing Every Consumer's Right to Maintain and Repair Their Property Themselves Or At the Independent Provider of Their Choice.**

53.     Tesla is not the first manufacturer to restrict consumers' ability to maintain and repair the products they purchase by limiting access to tools and components, or otherwise creating barriers designed to hinder independent repair. Many manufacturers, spanning a wide variety of industries, have similarly tried to force purchasers to utilize the manufacturers' own maintenance and repair services.

54.     The "right-to-repair" movement refers to concerted efforts, including proposed and enacted government legislation, aimed at protecting consumers' ability to maintain and repair the

products they purchase however they see fit, rather than being compelled to utilize the manufacturers' offered services.

55.     In 2012, Massachusetts voters passed a ballot initiative requiring OEMs selling motor vehicles in that state to "provide access to their diagnostic and repair information system through a non-proprietary vehicle interface." Although legislators in Massachusetts repealed the law a year later and replaced it with a compromise provision giving OEMs more time to make required technical changes, other states began passing similar statutes.

56.     Facing the potential for a variety of right-to-repair statutes with differing statutory requirements, in January 2014, motor vehicle manufacturers and trade groups representing independent repair shops and manufacturers of aftermarket parts entered into a Memorandum of Understanding (the "2014 MOU") creating a broad right to repair motor vehicles across the United States.

57.     Every major motor vehicle manufacturer signed onto the 2014 MOU *except* Tesla.[23]

58.     Notably, however, the 2014 MOU failed to address telematics—the data transmitted wirelessly from the vehicle to the manufacturer. Without access to telematic data, independent repair shops are unable to effectively service today's "connected" vehicles. In response, in or around 2019, various states (California, Georgia, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Missouri, Montana, North Dakota, Nevada, New Hampshire, New Jersey, New York, Oregon, South Dakota, Vermont, Virginia, Washington, West Virginia) began considering additional right-to-repair legislation. Such efforts are still underway,[24] which Tesla has actively fought.[25]

59.     According to the Federal Trade Commission ("FTC"), another way manufacturers have restricted consumers' ability to self-repair or utilize independent maintenance and repair services—besides

---

[23] *See* Nixing the Fix: An FTC Report to Congress on Repair Restrictions ("Nixing the Fix"), at pg. 45, n.249 https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (last accessed 2/3/23).
[24] Massachusetts had a ballot initiative that would require OEMs to make telematics available to independent repair shops, Ballot Question 1, which voters passed with overwhelming support in November 2020. *See* https://www.autocare.org/news/latest-news/details/2020/11/04/Consumers-to-Automakers-We-Want-the-Right-to-Repair-Our-Vehicles-6620 (last accessed 2/3/23).
[25] *See* https://electrek.co/2020/10/14/tesla-fights-right-to-repair-initiative-over-cybersecurity-concerns/ (last accessed 2/3/23).

CLASS ACTION COMPLAINT

limiting access to information, tools, and replacement parts—is by voiding vehicle warranties when maintenance or repair services are performed by anyone other than the dealer.[26]

60.     But, as explained by the FTC, manufacturers can restrict consumers from self-repair or utilizing independent maintenance and repair services even when their warranties do not explicitly require that all such services be performed by the manufacturer.[27] This is accomplished by, among other things:

-   Designing products in such a way as to complicate or prevent repairs, or to make independent repairs less safe;

-   Making parts and repair information unavailable;

-   Implementing policies or making statements that steer consumers to the manufacturer's repair networks and to the use of OEM parts;

-   Disparaging non-OEM parts and independent repair;

-   Application of patent rights and enforcement of trademarks;

-   Software locks and firmware updates; or

-   End User License Agreements.[28]

61.     Thus, manufacturers like Tesla can and do utilize various methods to discourage consumers from maintaining and repairing their own purchased goods or from having them serviced by independent repair shops.

62.     As explained by the U.S. Department of Justice ("DOJ") in a recent Statement of Interest filed in another right-to-repair class action, such repair restrictions harm consumers in at least three ways:

-   "First, repair restrictions can drive independent repair shops out of business by raising their costs or denying them key inputs, which, in turn, leaves consumers with fewer choices."

-   "Second, manufacturers' restrictions can delay repairs" by, among other things, "cutting the number of repair shops available to consumers," thus resulting in "fewer options for their time-sensitive repairs" or otherwise "stymie[ing]" independent repairs.

---

[26] *See* Nixing the Fix at pg. 6.
[27] *Id.*
[28] *Id.*

CLASS ACTION COMPLAINT

-   "Third, restrictions on repair aftermarkets can raise prices and reduce quality."[29]

63.    On July 9, 2021, President Biden issued his Executive Order on Promoting Competition in the American Economy which, among other things, included the following provision:

> To address persistent and recurrent practices that inhibit competition, the Chair of the FTC, in the Chair's discretion, is also encouraged to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority, as appropriate and consistent with applicable law, in areas such as:
> …
> (ii)  unfair anticompetitive restrictions on third-party repairs or self-repair of items….[30]

64.    As acknowledged by the White House's accompanying fact sheet, "[p]owerful equipment manufacturers…use proprietary repair tools, software, and diagnostics to prevent third-parties form performing repairs."[31] Therefore, one of the reasons for the Executive Order was to "[m]ake it easier and cheaper to repair items you own by limiting manufacturers from barring self-repairs or third-party repairs of their products," which is why the Executive Order "[e]ncourages the FTC to limit powerful equipment manufacturers from restricting people's ability to use independent repair shops or DIY repairs."[32]

### B.    Tesla and the Emergence of the EV Market.

65.    Tesla was founded in Palo Alto, California in 2003, with the goal of producing EVs. Its first vehicle, the Roadster, was released in 2008. That same year, Elon Musk became the CEO and product architect, positions he still holds today (although the latter position has since been renamed "Technoking").[33] The original manufacturing facility, known as "Nummi," continues to operate today and is described by Tesla as "our hub for Model S, Model 3, Model X and Model Y production" and as "one of the largest manufacturing sites in California."[34] Between 2008 and 2012, Tesla produced and sold approximately 2,400 Roadsters worldwide.[35]

---

[29] Statement of Interest of the United States, *In re: Deere & Company Repair Servs. Antitrust Litig.*, Case No. 3:22-cv-50188 (N.D. Ill. Feb. 13, 2023) [ECF No. 118], at pg. 2.
[30] *See* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/ (last accessed 2/17/23).
[31] *See* https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/09/fact-sheet-executive-order-on-promoting-competition-in-the-american-economy/ (last accessed 2/17/23).
[32] *Id*.
[33] *See* https://ir.tesla.com/corporate/elon-musk (last accessed 1/31/23).
[34] *See* https://www.tesla.com/fremont-factory (last accessed 1/31/23).
[35] *See* https://www.businessinsider.com/tesla-roadster-history-2016-3 (last accessed 1/31/23).

66.     In 2009, Tesla unveiled the Model S, a full-size sedan priced at $57,400 and deliveries of the Model S began in June 2012.[36] Unlike the Roadster, which had a production capacity of several hundred vehicles per year, the Model S had a production capacity of 400 vehicles per week.[37] Between 2015 and 2022, Tesla sold over 329,000 Model S sedans in the United States.[38]

67.     Tesla followed the success of the Model S with the Model X, a mid-size SUV announced in 2013 and delivered to consumers beginning in late-2015.[39] The entry-level version, the Model X 75D, started at $81,200.[40] Between 2015 and 2022, Tesla sold over 142,000 Model X SUVs in the United States.[41]

68.     Next, in 2016, Tesla introduced its first mass-market EV, a mid-size sedan called the Model 3 priced around $35,000.[42] And in 2019, it unveiled the Model Y, a compact SUV priced at $47,000.[43] Between 2017 and 2022, Tesla sold over 741,000 Model 3 sedans in the United States[44] and, between 2020 and 2022, Tesla sold over 292,000 Model Y SUVs in the United States.[45]

69.     By October 2022, Tesla had sold over 3 million EVs worldwide[46], generating $134 billion USD in EV sales and leasing revenue.[47] In the United States alone, Tesla sold approximately 1.5 million EVs between 2015 and 2022.[48]

70.     Due in large part to Tesla's success, adoption of EVs has accelerated dramatically. EV registrations in the United States increased 536% between 2016 and 2021, from 87,000 per year to 466,000 per year.[49]

---

[36] *See* https://www.tesla.com/blog/tesla-motors-sets-new-pricing-awardwinning-model-s (last accessed 1/31/23).
[37] *See* Tesla Fourth Quarter & Full Year 2012 Shareholder Letter, https://www.tesla.com/blog/tesla-motors-sets-new-pricing-awardwinning-model-s (last accessed 1/31/23).
[38] *See* https://carfigures.com/us-market-brand/tesla/model-s (last accessed 1/31/23).
[39] *See* https://www.theverge.com/2015/9/29/9414415/tesla-model-x-suv-launch-date (last accessed 1/31/23).
[40] *See* https://getjerry.com/electric-vehicles/evolution-tesla-model-x-2016-2019#2016-the-model-x-joins-the-tesla-family (last accessed 1/31/23).
[41] *See* https://carfigures.com/us-market-brand/tesla/model-x (last accessed 1/31/23).
[42] *See* https://www.cnn.com/2022/03/16/cars/tesla-model-3-price-increase/index.html (last accessed 1/31/23).
[43] *See* https://www.theverge.com/2019/3/14/18264446/tesla-model-y-suv-compact-announcement-price-release-date-features-elon-musk (last accessed 1/31/23).
[44] *See* https://carfigures.com/us-market-brand/tesla/model-3 (last accessed 1/31/23).
[45] *See* https://carfigures.com/us-market-brand/tesla/model-x (last accessed 1/31/23).
[46] *See* https://cars.usnews.com/cars-trucks/features/how-many-cars-has-tesla-sold (last accessed 1/31/23).
[47] Tesla Form 10-Ks for 2015-2021.
[48] *See* https://www.goodcarbadcar.net/tesla-us-sales-figures/ (last accessed 1/31/23).
[49] *See* https://www.iea.org/data-and-statistics/charts/electric-car-registrations-and-sales-share-in-china-united-states-europe-and-other-regions-2016-2021 (last accessed 1/31/23).

CLASS ACTION COMPLAINT

71.     In addition to selling EVs, Tesla also operates approximately 160 service centers in the United States.[50] According to its Form 10-Ks filed with the United States Securities and Exchange Commission ("SEC"), Tesla has generated $12 billion USD in "Services & Other" Revenue, which includes, among other things, non-warranty after-sales vehicle services.[51]

72.     One of the drivers behind Tesla's success has been the development of its Supercharger network, with Tesla owning and operating over 1,500 Supercharger locations throughout the United States, covering 52 states/territories and 1,116 American cities.[52] California alone has 305 Supercharger locations.

73.     As a result, Tesla's automotive sales figures keep rising. Since 2015, Tesla has sold over 3.5 million cars representing nearly $200 billion USD in revenue worldwide.



---

[50] A list of all U.S. Tesla Service Centers can be found at https://www.tesla.com/findus/list/services/united%20states.
[51] Tesla Form 10-Ks for 2015-2021.
[52] *See* https://www.scrapehero.com/location-reports/Tesla%20Superchargers-USA/ (last accessed 1/31/23).

CLASS ACTION COMPLAINT



74.     The number of Tesla store and service locations and the number of vehicles in Tesla's Mobile Service Fleet have also grown, but at a much slower pace when compared to the number of Tesla EVs on the road.





75.     This is most apparent when comparing the number of Tesla's Mobile Service Fleet and service locations[53] to the cumulative number of Tesla EVs delivered over time—*i.e.*, the approximate number of Tesla EVs actually on the road.



---

[53] Tesla's SEC filings do not break out Tesla sales by location, nor do they differentiate between new stores versus new service locations. Therefore, these values are global and include new store locations as well as new service locations.

16

**C.    Tesla Purposely Designs Its Vehicles Such That Repairs and Maintenance Require Access to Diagnostic Information, Telematics, and Tesla-Compatible Parts, But Then Limits Access to Them.**

76.    According to Tesla, one of the key advantages of EVs over ICE vehicles is that EVs require less maintenance and result in fewer repairs. In fact, Tesla has long touted how "[w]ith no regularly scheduled maintenance and fewer moving parts to repair, we design every Tesla vehicle with the goal of eliminating the need for service. Paired with remote diagnostics and over-the-air software updates that regularly improve your car, you'll spend less time in the shop and more time on the road."[54]

77.    In practice, Tesla has fallen far short of these goals and promises. According to one recent analysis by J.D. Power, Tesla EVs experience 226 problems per 100 vehicles, whereas ICE vehicles, on average, experience 175 problems per 100 vehicles.[55] As a result, Tesla ranks poorly in reliability rankings. JD Power recently found that Tesla had the third-worst reliability score of all motor vehicle manufacturers.[56] Meanwhile, Consumer Reports recently ranked Tesla second-to-last in reliability.[57]

78.    By designing its EVs such that repairs require access to remote diagnostics and over-the-air software updates, Tesla effectively limits anyone other than Tesla from being able to provide maintenance and repair services for its EVs.

79.    As described by Tesla in a communication to its investors: "Our vehicles are designed with the capability to wirelessly **upload data to _us_** via an on-board system with cellular connectivity, **allowing _us_ to diagnose and remedy** many problems before ever looking at the vehicle. When maintenance or service is required, a customer can schedule service by contacting **one of _our_ Tesla service centers** or **_our_ Tesla mobile technicians** can perform an array of services from a customer's home or other remote location."[58]

80.    To ensure that the owners of its EVs utilize only Tesla service centers and mobile technicians, Tesla "has historically made it really hard for tinkerers [and independent repair shops] to be able to repair and modify [Tesla] cars by limiting access to documentation and parts."[59]

---

[54] https://www.tesla.com/service (last accessed 2/3/23).
[55] *See* https://www.jdpower.com/business/press-releases/2022-us-initial-quality-study-iqs (last accessed 2/3/23).
[56] *See* https://www.jdpower.com/business/press-releases/2021-us-vehicle-dependability-study-vds (last accessed 2/7/23).
[57] *See* https://insideevs.com/news/549130/consumerreports-tesla-reliability-poor-2021/ (last accessed 2/7/23).
[58] Tesla 2017 Form 10-K at 16 (emphases added).
[59] https://electrek.co/2018/10/29/tesla-parts-catalog-model-3-model-s-model-x-roadster-public/ (last accessed 2/3/23).

CLASS ACTION COMPLAINT

81.     Indeed, Massachusetts residents, thanks to its right-to-repair statute, are the only ones who were initially provided access to Tesla repair manuals and parts information.

82.     In or around August 2021, Tesla made some of its service manuals available online. These manuals originally required the purchase of a $3,187 annual subscription.[60] But in or around May 2022, Tesla's website was revised to reflect that subscription costs were now complimentary.[61] However, diagnostic software still requires an annual subscription of $3,000 per year.[62]

83.     Tesla also has limited access to the parts needed to repair its EVs. While Tesla did open its parts catalog to the public in 2018,[63] consumers must submit an application to Tesla in order to actually make purchases or even view prices.[64] This application is clearly targeted at professional repair shops (as opposed to individuals), as indicated by questions asking for the "Applicant Shop Physical Address" and "Facility Pictures" including photos of the applicant's "Spray Booth" and "Parts Area."[65]

84.     More importantly, even if an applicant is ultimately allowed to purchase replacement parts from Tesla, numerous parts in Tesla's catalog are unavailable for purchase. While some are listed as "Over-the-Counter (No VIN)," many parts are listed as "Not for Resale" or "Restricted."

85.     Not surprisingly, given the limited nature of the public access Tesla has granted to its manuals, diagnostic software, and replacement parts, Tesla owners still have few if any options for servicing their EVs, other than scheduling a service appointment with Tesla.

**D.     Tesla's Warranty and Related Policies Threaten Owners That They May Lose Warranty Coverage If They Service Their EVs Anywhere Other Than Tesla.**

86.     Another way in which Tesla limits those who purchase its EVs from repairing their own vehicles or using independent repair shops is through its warranty and related policies. While Tesla's new vehicle warranties do not expressly require owners to purchase parts and service for their Tesla EVs only through Tesla's app, they strongly discourage owners from obtaining parts or services anywhere else, or risk voiding their warranties.

---

[60] *See* https://insideevs.com/news/587165/tesla-service-manuals-now-free-of-charge-grab-them-while-you-can/ (last accessed 2/3/23).
[61] *Id. See also* https://service.tesla.com/service-subscription (last accessed 2/3/23).
[62] *Id.*
[63] *See* https://electrek.co/2018/10/29/tesla-parts-catalog-model-3-model-s-model-x-roadster-public/ (last accessed 2/3/23).
[64] *See* https://epc.teslamotors.com/#/catalogs (last accessed 2/3/23).
[65] *Id.*

87. According to Tesla's New Vehicle Limited Warranty for Model S, Model X, and Model 3 EVs sold in the United States and Canada:

> Although Tesla does not require you to perform all service or repairs at a Tesla Service Center or Tesla authorized repair facility, ***this New Vehicle Limited Warranty may be voided or coverage may be excluded due to improper maintenance, service or repairs***. Tesla Service Centers and Tesla authorized repair facilities have special training, expertise, tools and supplies with respect to your vehicle and, in certain cases, may employ the only persons or be the only facilities authorized or certified to work on certain parts of your vehicle. ***Tesla strongly recommends that all maintenance, service and repairs be done at a Tesla Service Center or Tesla authorized repair facility in order to avoid voiding, or having coverage excluded under, this New Vehicle Limited Warranty***.[66]

88. Echoing the warranty policies, the "Frequently Asked Questions" section of Tesla's Vehicle Warranty webpage includes the following:

**Do I have to take my vehicle to the Tesla Service Center?**

> With over-the-air software updates, remote diagnostics and the support of our Mobile Service technicians, the need for a Service Center visit is reduced. If your vehicle does require service, you can schedule a service appointment in the Tesla app. ***If you choose to take your vehicle to a non-Tesla shop for maintenance or repairs, coverage under your warranty could be affected if problems occur***.[67]

89. Similarly, the Tesla Parts, Body & Paint Repair Limited Warranty only covers "Tesla branded an manufactured parts purchased directly from Tesla over-the-counter, online or purchased and installed by Tesla Service or Tesla Body Shops."[68]  Moreover, labor charges to repair or replace covered parts are only covered under Tesla's parts warranty "[i]f the Part or Used Part was installed by Tesla."

90. The Tesla Parts, Body & Paint Repair Limited Warranty further warns that it will "not cover damage or malfunction directly or indirectly caused by…improper repair or maintenance, including use of non-genuine Tesla accessories or Parts."[69] It continues:

> Although Tesla does not require you to perform all maintenance, service or repairs at a Tesla Service Center or Tesla authorized repair facility, ***this Tesla Parts, Body and Paint Limited Warranty may be voided, or coverage may be excluded, due to lack of or improper maintenance, installation, service or repairs***. Tesla Service Centers and Tesla authorized repair facilities have special training, expertise, tools

---

[66] https://www.tesla.com/sites/default/files/downloads/tesla-new-vehicle-limited-warranty-en-us.pdf (last accessed 2/3/23) (emphases added).
[67] https://www.tesla.com/support/vehicle-warranty (last accessed 2/3/23) (emphases added).
[68] *See* https://www.tesla.com/sites/default/files/downloads/tesla-parts-accessories-body-repair-limited-warranty-en-us.pdf (last accessed 3/13/23).
[69] https://www.tesla.com/sites/default/files/downloads/tesla-parts-accessories-body-repair-limited-warranty-en-us.pdf (last accessed 2/3/23).

CLASS ACTION COMPLAINT

and supplies with respect to Tesla Parts, Body and Paint repairs, and, in certain cases, may employ the only persons, or be the only facilities authorized or certified to work on Tesla Parts, Body and Paint. ***Tesla strongly recommends that you have all maintenance, service and repairs done at a Tesla Service Center or Tesla authorized repair facility in order to avoid voiding, or having coverage excluded under, this Tesla Parts, Body and Paint Limited Warranty***.[70]

91.     Tesla's owners' manuals more explicitly prohibit the use of non-OEM, Tesla-compatible parts, instead instructing owners only to use parts purchased from and installed by Tesla:



92.     Online forums, such as www.teslamotorsclub.com, are replete with stories by Tesla owners of Tesla invalidating warranties or otherwise refusing to honor warranties because owners had non-OEM, Tesla-compatible parts installed on their EVs.

---

[70] *Id.*

CLASS ACTION COMPLAINT

93.    In one example, Tesla refused to replace a cracked window under warranty, instead charging an owner $460, because the owner had installed a completely unrelated part—an aftermarket puddle light—at the bottom of the car door.[71]

94.    However, it is even more common to find Tesla owners on these forums choosing not to use independent repair shops or aftermarket parts in the first instance for fear of losing warranty coverage.

95.    In addition, Tesla's "Unsupported or Salvaged Vehicle Policy" warns "[r]epairs performed to bring a salvaged vehicle back into service may not meet Tesla standards or specifications and that is why the vehicle is unsupported."[72] Among other things, vehicles designated "unsupported" by Tesla have their warranties voided and access to Tesla's Supercharger network is permanently disabled.[73]

96.    Thus, if a Tesla owner's EV is deemed a salvaged vehicle and the owner has it repaired anywhere other than Tesla, Tesla can unilaterally designate the vehicle as "unsupported," thus voiding the vehicle's warranty and preventing the owner from using Tesla's Supercharger network. Moreover, according to some sources, Tesla not only disables supercharging on Tesla's Supercharger network, it also prevents vehicles from accessing third-party fast charging networks.[74]

97.    As discussed above, Tesla manufactures some components for its EVs, while it purchases other components from suppliers around the world. As stated by Tesla itself:

> Our vehicles use over 3,000 purchased parts which we source globally from over 350 suppliers. We have developed close relationships with several key suppliers particularly in the procurement of cells and other key system parts. While we obtain components from multiple sources in some cases, similar to other automobile manufacturers, many of the components used in our vehicles are purchased by us from a single source.[75]

98.    Tesla further restricts the availability of both OEM and non-OEM Tesla-Compatible Parts by, among other things, requiring at least some its suppliers to enter into *de facto* exclusivity agreements preventing those suppliers from manufacturing Tesla-compatible parts for anyone other than Tesla.

99.    For example, a contract between Tesla and Panasonic filed with the SEC in 2014 states:

---

[71] *See* https://teslamotorsclub.com/tmc/threads/tesla-claims-warranty-is-void-due-to-aftermarket-puddle-lights.236475/ (last accessed 2/3/23).
[72] https://www.tesla.com/legal/additional-resources#unsupported-or-salvaged-vehicle-policy (last accessed 2/9/23).
[73] *Id.*
[74] *See* https://insideevs.com/news/399152/tesla-disable-fast-charging-salvage/ (last accessed 2/9/23).
[75] Tesla Motors, Inc. 2015 Form 10-K at pg. 9.

CLASS ACTION COMPLAINT

The tooling, jibs, dies, gauges, fixtures, molds, patterns, other equipment (collectively, the "Tooling"), as well as the supplies, materials, and other tangible property that are or will be used by Seller to manufacture, store, and transport Goods, or used to develop or make Goods for Tesla (such Tooling, supplies, materials and other tangible property shall collectively be referred to as "Property") will be owned by Tesla if Tesla has [***] ("Tesla Property").[76]

100.   Such contract provisions are intentionally designed to prevent Tesla's OEM parts suppliers from producing Tesla-compatible parts for anyone other than Tesla. Absent such contract provisions, Tesla's OEM parts suppliers could sell Tesla-compatible parts to parties other than Tesla (*e.g.*, automotive parts distributors), who could then resell them to Tesla owners and independent repair shops, thus promoting competition in the Tesla-Compatible Parts market.

### E.   Tesla's Monopolization of the Tesla Repair Services and Tesla-Compatible Parts Markets Has Led to Artificially Inflated Prices, Decreased Supply, and Burdensome Wait Times.

101.   The lack of competition in the Tesla Repair Services and Tesla-Compatible Parts markets caused by Tesla's misconduct has resulted in artificially inflated prices, insufficient supply, and excessive wait times for Tesla owners looking to maintain or repair their EVs.

102.   But for Tesla's anticompetitive and monopolistic course of conduct, Tesla owners would have similar maintenance and repair options as purchasers of ICE vehicles—*i.e.*, they would be able to service their EVs themselves, at an independent repair shop, or at Tesla using OEM or non-OEM parts purchased from a retailer, independent repair shop, or Tesla itself. Such competition would inevitably lead to increased supply and lower prices.

103.   Instead, Tesla owners are forced to buy Tesla Repair Services and Tesla-Compatible Parts only from Tesla. Not only has this resulted in Tesla owners paying artificially inflated prices for Tesla Repair Services and Tesla-Compatible Parts, but they also have been forced to suffer exorbitant wait times in receiving those parts and services from Tesla.

104.   The shortage in available service appointments and the frequency of backordered OEM parts can be directly attributed to the lack of independent repair shops and non-OEM replacement parts caused by Tesla's anticompetitive conduct.

---

[76] https://www.sec.gov/Archives/edgar/data/1318605/000119312516735804/d253219dex102.htm (redacted portion filed confidentially and unavailable online).

CLASS ACTION COMPLAINT

105.    Making matters worse, Tesla has not increased its service capacity at a sufficient pace to keep up with its growth in EV sales.

106.    Elon Musk, Tesla's CEO and "Technoking," acknowledged Tesla's service-related shortcomings via Twitter: "Just reviewed Tesla's service locations in North America & realized we have major gaps in geographic coverage! Sorry for this foolish oversight." (Twitter, @elonmusk, Oct. 16, 2018 at 6:30pm).

107.    The shortcomings in Tesla service are widely documented. In an investigative piece done by Vox's Recode, journalists obtained over 1,000 consumer complaints filed with the FTC about Tesla, more than 120 of which "discussed specific problems with service, delays, and parts."[77] As further elaborated upon by Recode, "[t]he complaints point to all sorts of problems with the experience of owning a Tesla vehicle, including an inadequate number of service centers, limited stock of replacement parts, bad communication, poor manufacturing quality, and long wait times for repair appointments."[78]

108.    Assuming one can get a service appointment, the cost of maintaining and repairing a Tesla is higher than it should be:

> The two biggest problems with repairing a Tesla are the wait time and cost. Owners often wait weeks and even months for simple jobs to be finished. When an owner does get their car repaired, the costs are often outlandish. [One right-to-repair advocate] said that some shops charge upwards of $200 an hour for labor alone. … "Imagine coughing up $200 an hour for a diagnostic fee. That's McLaren prices."[79]

109.    While Tesla charges $200 an hour or more for Tesla Repair Services, the average hourly rate for mechanic work in the United States is between $75 and $130.[80]

110.    In addition to the higher labor costs, Tesla replacement parts are also more expensive than they would otherwise be but for Tesla's anticompetitive conduct.

111.    For example, a brand new OEM front drive unit for the Ford Mustang Mach-E (Part#: 7B000) can be purchased directly from Ford for $2,094.28.[81] A brand new OEM front drive unit for the

---

[77] https://www.vox.com/recode/23318725/tesla-repair-mechanic-delay-electric-vehicles-ev (last accessed 2/9/23).
[78] *Id.*
[79] https://www.vice.com/en/article/93wy8v/newly-passed-right-to-repair-law-will-fundamentally-change-tesla-repair (last accessed 2/9/23).
[80] *See* https://www.repairsmith.com/blog/how-much-does-mechanic-charge-per-hour/ (last accessed 2/9/23).
[81] https://parts.ford.com/shop/en/us/engine/engine-electrical/drive-13813527-1 (last accessed 2/9/23).

CLASS ACTION COMPLAINT

Chevy Bolt (Part#: 25202122) can be purchased directly from Chevrolet for $2,171.74.[82] Tesla's online catalog, by comparison, states that the front drive unit assembly for the Model 3 (Part # 1120960-10-H) is "Restricted." However, a used Tesla front drive unit sells online for $9,500.[83]

112.    Taking labor and parts both into account, it should come as no surprise that maintenance costs for Tesla's are higher than other motor vehicles. The average cost to maintain a Tesla EV is $832 per year, whereas the average cost for all motor vehicles sold in the United States is only $652 per year.[84]

113.    The lack of supply and higher prices are compounded by Tesla's practice of simply replacing parts or whole assemblies instead of devising repairs to address the issue.

114.    For example, according to one Tesla service employee speaking to a reporter who test drove a Model Y, "the company only allows the service center to replace whole sections of the interior, and not replace small parts (and even then, many small parts cannot be removed/replaced at all without replacing the whole thing)."[85]

115.    As another example, it is widely discussed on Tesla forums that 2018 and earlier Model S Performance models have a defective rear-drive unit containing a faulty seal that often results in a small leak, causing the part to fail.[86] Although a small handful of independent repair shops have apparently engineered an inexpensive fix for this problem, Tesla tells owners of these vehicles that the cost of replacing the rear-drive unit is $7,500 and, oftentimes, recommends that the owner "scrap" the car.[87]

116.    In yet another example, one Tesla Model 3 lessee accidentally drove over some road debris which then struck and damaged the vehicle's coolant system, causing coolant to leak from the battery pack.[88] After towing the vehicle to a Tesla service center, the lessee was informed that the damage was not covered by warranty, that the battery could not be repaired and would need to be replaced, and

---

[82] https://parts.chevrolet.com/product/gm-genuine-parts-drive-motor-rotor-25202122?bac=267455,224441,113051,151952,113030,300180,279479,130575,113023,113136,296149,287372,112024,200252,114659,313607,232873,289991,112438,113121,113114,113123,308005,117681,113111 (last accessed 2/9/23).
[83] https://stealthev.com/product/tesla-front-drive-unit/ (last accessed 2/9/23).
[84] See https://jalopnik.com/advisor/tesla-maintenance-cost/ (last accessed 2/7/23).
[85] See https://cleantechnica.com/2021/05/02/tesla-model-y-big-family-test-mostly-good-but-there-might-be-one-death-star-type-weakness/ (last accessed 2/9/23).
[86] See https://teslamotorsclub.com/tmc/threads/out-of-warranty-drive-unit-replacement-and-cost.226436/ (last accessed 2/3/23).
[87] See https://teslamotorsclub.com/tmc/threads/out-of-warranty-drive-unit-failure-service-center-recommends-to-scrap-the-car.273103/ (last accessed 2/3/23).
[88] See https://getjerry.com/insights/costly-tesla-fix-shows-right-to-repair-matters#a-tesla-drivers-dilemma (last accessed 2/9/23).

that the cost of the replacement was $16,000. Later, the lessee was put in contact with an independent repair shop that had seen this issue before and devised a fix costing only $700.

117.   Such examples demonstrate how right-to-repair legislation and the lack of independent repair shops directly impact Tesla EV owners.

**F.   There Are No Legitimate Procompetitive Reasons for Tesla's Right-to-Repair Opposition**

118.   As discussed above, Tesla not only refused to sign onto the 2014 MOU, it also actively fought passage of Massachusetts Ballot Question 1—the initiative aimed at providing consumers and independent repair shops with access to wireless telematics systems like the ones used by Tesla.

119.   In opposing Ballot Question 1, Tesla sent a letter to its Massachusetts customers urging them to vote against the initiative, arguing, among other things, that the measure would open vehicles to cyber-attacks.[89] Tesla provided no evidence to substantiate this claim.

120.   In its recent report to Congress regarding the impact of repair restrictions on consumers and independent repair shops, the FTC addressed the arguments made by manufacturers generally, not specific to Tesla, to justify their repair restrictions. Ultimately, the FTC's extensive investigation found "there is scant evidence to support manufacturers' justifications for repair restrictions."[90] In addition to cybersecurity, the FTC addressed and refuted several other concerns identified by manufacturers in defending their repair restrictions, including safety, quality of service, liability/reputational harm, and consumer's design preferences.

121.   With respect to cybersecurity, the FTC found that "[t]he record contains no empirical evidence to suggest that independent repair shops are more or less likely than authorized repair shops to compromise or misuse customer data."[91]

122.   With respect to safety, the FTC noted that there was no factual support for manufacturers' assertions that "authorized repair persons are more careful or that individuals or independent repair shops

---

[89] *See* https://fighttorepair.substack.com/p/teslas-a-vocal-opponent-of-the-right (last accessed 2/9/23).
[90] Nixing the Fix at pg. 6.
[91] *Id*. at 31.

**CLASS ACTION COMPLAINT**

fail to take appropriate safety precautions, or that independent repair workers who enter homes pose more of a safety risk to consumers than authorized repair workers."[92]

123.    With respect to quality of service, the FTC pointed to a Consumer Reports survey indicating that "consumers who used independent repair shops were more satisfied with repairs than those who used factory service," as well as a submission by the Auto Care Association that noted "70-75% of consumers use independent repair shops due mostly to trust, convenience, and price," before concluding "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[93]

124.    With respect to liability/reputational harm, the FTC described how, despite asking for data on the assertions made by manufacturers, "[m]anufacturers provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[94]

125.    Finally, with respect to purportedly consumer-driven design choices, the FTC noted that "[r]ight to repair advocates argue that consumers care about repairability, in addition to aesthetic design, but do not have the necessary information at the point of sale to purchase products that are repairable."[95]

## CLASS ACTION ALLEGATIONS

126.    Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) as representative of the following Class:

> All persons or entities in the United States who paid Tesla for Tesla Repair Services or Tesla-Compatible Parts March 2019 to the present (the "Class Period").

> Excluded from the Class are Tesla, any entity in which Tesla has an interest, any of Tesla's parents, subsidiaries, affiliates, officers, directors, legal representatives, successors and assigns, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

127.    Plaintiff reserves the right to modify these definitions and/or to propose subclasses, as appropriate, based on further investigation and discovery.

---

[92] *Id*. at 28.
[93] *Id*. at 38.
[94] *Id*. at 33.
[95] *Id*. at 34.

128.    This action is being brought and may be properly maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Federal Rule of Civil Procedure 23(b)(3).

129.    <u>Numerosity</u>. The members of the proposed Class are so numerous that joinder of all members would be impracticable. The exact number of Class members is unknown to Plaintiff at this time, but it is estimated to number in the hundreds of thousands. The identity of Class members is readily ascertainable from Tesla's records.

130.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of the proposed Class because Plaintiff paid Tesla for Tesla Repair Services and Tesla-Compatible Parts during the Class Period, and his claims arise from the same anticompetitive course of conduct by Tesla.

131.    <u>Adequacy</u>. Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class members. Plaintiff is represented by attorneys experienced in the prosecution of class action litigation generally, and in antitrust litigation specifically, who will vigorously prosecute this action on behalf of the Class.

132.    <u>Common Questions of Law and Fact Predominate</u>. Questions of law and fact common to the Class members predominate over questions that may affect only individual Class members because Tesla has acted on grounds generally applicable to the Class. The following questions of law and fact are common to the Class and predominate over any individual issues:

(a)  Whether Tesla is a monopolist in the United States EV market;

(b)  Whether Tesla is a monopolist in the United States Tesla Repair Services market;

(c)  Whether Tesla is a monopolist in the United States Tesla-Compatible Parts market;

(d)  Whether Tesla designed its warranty- and related-policies to discourage Tesla owners from obtaining Tesla Repair Services or Tesla-Compatible Parts from anyone other than Tesla;

(e)  Whether Tesla designed its vehicles such that maintenance and repairs require access to diagnostics and telematics accessible only through remote management tools exclusively accessed by Tesla;

(f)  Whether Tesla unreasonably restricted access to its manuals, diagnostic tools, vehicle telematic data, and OEM replacement parts;

CLASS ACTION COMPLAINT

(g) Whether Tesla used its contracts with OEM parts manufacturers to prevent other, non-OEM parts manufacturers from producing Tesla-Compatible Parts;

(h) Whether Tesla's course of conduct was anticompetitive;

(i) Whether Tesla's course of conduct constitutes an unreasonable restraint of trade;

(j) Whether, absent Tesla's course of conduct, independent repair shops would have entered the Tesla Repair Services or Tesla-Compatible Parts markets in the United States;

(k) Whether market entry by other participants would have encouraged competition, resulting in lower prices or greater supply of Tesla Repair Services or Tesla-Compatible Parts in the United States; and

(l) Whether Tesla's conduct should be enjoined or whether other appropriate equitable relief is warranted.

133. <u>Superiority</u>. A class action will permit numerous similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, or expense. A class action will provide injured persons a method for obtaining redress on claims that could not practicably be pursued individually. Plaintiff knows of no manageability or other issue that would preclude maintenance of this case as a class action.

134. <u>Injunctive relief</u>. Tesla has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole.

## INTERSTATE TRADE & COMMERCE

135. Tesla's anticompetitive conduct has taken place in, and negatively affected the continuous flow of, interstate trade and commerce in the United States in that, among other things, it has:

(a) Sold EV, Tesla Repair Services, and Tesla-Compatible Parts to customers online and through its physical store locations throughout the United States;

(b) Used the instrumentalities of interstate commerce to provide such goods and services throughout the United States;

(c) In furtherance of its anticompetitive scheme alleged herein, traveled between states and exchanged communications through interstate wire communications and via the United States mail; and

(d) Through the anticompetitive scheme alleged herein, affected billions of dollars of commerce.

## ANTITRUST INJURY

136.    Tesla's anticompetitive conduct had the following effects, among others:

(a) Competition has been restrained or eliminated with respect to Tesla Repair Services and Tesla-Compatible Parts, thus depriving purchasers of Tesla Repair Services and Tesla-Compatible Parts of the benefits of free and open competition;

(b) The prices paid for Tesla Repair Services and Tesla-Compatible Parts have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

(c) In addition to paying artificially inflated prices, purchasers of Tesla Repair Services and Tesla-Compatible Parts have suffered long wait times to receive parts and services.

137.    The purpose and effect of this anticompetitive course of conduct was to exclude competition and raise, fix, or maintain the price for Tesla Repair Services and Tesla-Compatible Parts. As a direct and foreseeable result, Plaintiff and the proposed Class paid supracompetitive prices for Tesla Repair Services and Tesla-Compatible Parts during the Class Period.

138.    By reason of the antitrust violations alleged herein, Plaintiff and the proposed Class have sustained injury to their businesses or property, and as a result have suffered damages.

139.    These injuries—the payment of supracompetitive prices—are of the type that the antitrust laws were intended to compensate and prevent.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF § 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Monopolization of the Tesla Repair Services Market
### (On behalf of the Class)

140.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

141.     This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

142.     Tesla has monopoly power in the EV, Tesla Repair Services, and Tesla-Compatible Parts markets, including the ability to control prices and exclude competition in those markets.

143.     Tesla willfully and intentionally engages in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining its monopoly in the Tesla Repair Services market.

144.     This anticompetitive conduct, which has unreasonably restrained and threatens to continue unreasonably restraining competition in the Tesla Repair Services market, includes at least the following:

(a)  Implementing vehicle warranties and other policies designed to actively discourage Tesla EV owners from obtaining Tesla Repair Services other than those offered by and through Tesla, thus tying the purchase of Tesla Repair Services to the purchase of Tesla EVs;

(b)  Designing its EVs such that most maintenance and repairs require access to diagnostics and telematics accessible only through remote management tools exclusively accessed by Tesla; and

(c)  Limiting access to its manuals, diagnostic tools, vehicle telematic data, and OEM replacement parts.

145.     As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Repair Services, experiencing shortages of available service appointments and long wait times in receiving Tesla Repair Services, and being generally deprived of the competitive benefits which otherwise would have resulted from the option of servicing, repairing, and maintaining their EVs themselves or through independent repair shops.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF § 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the Tesla Repair Services Market**
**(On behalf of the Class)**

146. Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

147. Even assuming Tesla did not have monopoly power in the Tesla Repair Services market, at a minimum, Tesla has a dangerous probability of success in acquiring monopoly power in that market.

148. Tesla willfully and intentionally engages in the predatory, exclusionary, and anticompetitive conduct described herein with the design, purpose, and effect of attempting to monopolize the Tesla Repair Services market.

149. Tesla's predatory, exclusionary, and anticompetitive conduct as alleged herein presents a dangerous probability that Tesla will succeed, to the extent it has not succeeded already, in its attempt to monopolize the Tesla Repair Services market. The unlawful objective of Tesla's attempt to monopolize the Tesla Repair Services market is to control prices and restrain competition.

150. As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Repair Services, experiencing shortages of available service appointments and long wait times in receiving Tesla Repair Services, and being generally deprived of the competitive benefits which otherwise would have resulted from the option of servicing, repairing, and maintaining their EVs themselves or through independent repair shop.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF § 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Monopolization of the Tesla-Compatible Parts Market**
**(On behalf of the Class)**

151. Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

152.     This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

153.     Tesla has monopoly power in the EV, Tesla Repair Services, and Tesla-Compatible Parts markets, including the ability to control prices and exclude competition in those markets.

154.     Tesla willfully and intentionally engages in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining its monopoly in the Tesla-Compatible Parts market.

155.     This anticompetitive conduct, which has unreasonably restrained and threatens to continue unreasonably restraining competition in the Tesla-Compatible Parts market, includes at least the following:

(a) Implementing vehicle warranties and other policies designed to actively discourage Tesla EV owners from obtaining Tesla-Compatible Parts other than those offered by and through Tesla, thus tying the purchase of Tesla-Compatible Parts to the purchase of Tesla EVs;

(b) Limiting access to its manuals, diagnostic tools, vehicle telematic data, and OEM replacement parts; and

(c) Using its contracts with OEM parts manufacturers to limit the availability of Tesla-Compatible Parts from any source other than Tesla.

156.     As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla-Compatible Parts, experiencing parts shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts, and being generally deprived of the competitive benefits which otherwise would have resulted from the option of utilizing Tesla-Compatible Parts from sources other than Tesla to service, repair, and maintain their EVs.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF § 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the Tesla-Compatible Parts Market**
**(On behalf of the Class)**

157.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

158.    Even assuming Tesla did not have monopoly power in the Tesla-Compatible Parts market, at a minimum Tesla has a dangerous probability of success in acquiring monopoly power in those markets.

159.    Tesla willfully and intentionally engages in the predatory, exclusionary, and anticompetitive conduct described herein with the design, purpose, and effect of attempting to monopolize the Tesla-Compatible Parts market.

160.    Tesla's predatory, exclusionary, and anticompetitive conduct alleged herein presents a dangerous probability that Tesla will succeed, to the extent it has not succeeded already, in its attempt to monopolize the Tesla-Compatible Parts markets. The unlawful objective of Tesla's attempt to monopolize the Tesla-Compatible Parts market is to control prices and restrain competition.

161.    As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla-Compatible Parts, experiencing parts shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts, and being generally deprived of the competitive benefits which otherwise would have resulted from the option of utilizing Tesla-Compatible Parts from sources other than Tesla to service, repair, and maintain their EVs.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**Unlawful Tying**
**(On behalf of the Class)**

162.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

CLASS ACTION COMPLAINT

163.    An unlawful tying arrangement exists, and constitutes a *per se* violation of Section 1 of the Sherman Act, where a seller conditions the sale of a good or service in one market in which the seller has market power (the "tying" product) upon the buyer's agreement to (a) buy a second good or service (the "tied" product) from the seller or (b) refrain from buying that same good or service from a competing seller.

164.    Tesla EVs, Tesla Repair Services, and Tesla-Compatible parts are all separate and distinct products and services. Tesla has market power in all three markets.

165.    Moreover, consumers cannot reasonably estimate the total aggregate cost of all Tesla Repair Services and Tesla-Compatible Parts that will need to be purchased over the lifetime of their EVs at the time of purchase, and Tesla affirmatively gives consumers the false impression that this total aggregate cost will be lower than for other motor vehicles.

166.    By virtue of the anticompetitive conduct alleged herein, Tesla has engaged in three separate tying arrangements.

167.    First, Tesla leverages its market power in the EV market (*i.e.*, the tying product) to coerce Plaintiff and the proposed Class into purchasing Tesla Repair Services and Tesla-Compatible Parts (*i.e.*, the tied products and services) only from Tesla, thus restraining competition in those markets and excluding other sellers of the tied products and services.

168.    Second, Tesla leverages its market power in the Tesla-Compatible Parts market (*i.e.*, the tying product) to coerce Plaintiff and the proposed Class into purchasing Tesla Repair Services (*i.e.*, the tied services) only from Tesla, thus restraining competition in the Tesla Repair Services market and excluding other sellers of Tesla Repair Services.

169.    Third, Tesla leverages its market power in the Tesla Repair Services market (i.e., the tying product) to coerce Plaintiff and the proposed Class into purchasing Tesla-Compatible Parts only from Tesla, thus restraining competition in the Tesla-Compatible Parts market and excluding other sellers of Tesla-Compatible Parts.

170.    All three of these tying arrangements affected a substantial amount of interstate commerce and Tesla has a substantial economic interest in sales of Tesla EVs, Tesla Repair Services, and Tesla-Compatible Parts.

CLASS ACTION COMPLAINT

171.    There are no legitimate procompetitive business justifications for Tesla's unlawful tying arrangements.

172.    In the event that Tesla's anticompetitive course of conduct is not deemed to be a *per se* violation of Section 1 of the Sherman Act, it also constitutes a violation under both the rule of reason and a "quick look" analysis, as an observer even with a rudimentary understanding of economics could readily conclude that the conduct in question has had an anticompetitive effect on, and unreasonably restrained competition in, the markets for Tesla Repair Services and Tesla-Compatible Parts.

173.    As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type that the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Repair Services and Tesla-Compatible Parts, experiencing shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts, and being generally deprived of the competitive benefits which otherwise would have resulted from the option of servicing, repairing, and maintaining their EVs themselves or through independent repair shops.

## SIXTH CLAIM FOR RELIEF
### VIOLATION OF § 102(C) OF THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2302
### Prohibited Warranty Tying
### (On behalf of the Class)

174.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

175.    The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. ("MMWA"), creates a civil cause of action for "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter." 15 U.S.C. § 2310(d)(1).

176.    The amount in controversy of Plaintiff's and each member of the proposed Class's individual claims is greater than $25 and the cumulative sum of all of their claims is greater than $50,000. Plaintiff does not bring this cause of action for failure to comply with an obligation under a written or implied warranty; rather, she brings this cause of action on behalf of himself and the proposed Class for Tesla's violation of the MMWA's rules governing the contents of warranties.

177.    Section 102(c) of the MMWA prohibits warrantors of consumer products from conditioning warranties "on the consumer's using, in connection with such product[s], any article or service (other than article or service provided without charge under the terms of the warranty) which is defined by brand, trade, or corporate name," unless the warrantor obtains a waiver from the FTC. 15 U.S.C. § 2302(c).

178.    Section 700.10 of the Code of Federal Regulations provides further guidance as to the types of tying conduct prohibited by Section 102(c) of the MMWA. It states in relevant part:

> No warrantor may condition the validity of a warranty on the use of only authorized repair service and/or authorized replacement parts for non-warranty service and maintenance (other than an article of service provided without charge under the warranty or unless the warrantor has obtained a waiver pursuant to section 102(c) of the Act, 15 U.S.C. 2302(c).

179.    As an example, Section 700.10 further states "a provision in the warranty such as, 'use only an authorized "ABC" dealer' or 'use only "ABC" replacement parts,' is prohibited where the service or parts are not provided free of charge pursuant to the warranty."

180.    While Tesla's warranties do not expressly require that Tesla EV owners utilize only Tesla Repair Services or Tesla-Compatible Parts purchased from Tesla, Tesla makes it clear that this is an implicit requirement by, among other things, "strongly recommend[ing]" that all services be performed and parts purchased from Tesla and threatening to void warranty coverage if they are purchased elsewhere.

181.    Similarly, Tesla's parts warranty only extends coverage if the parts are purchased directly from Tesla through its website or purchased and installed by Tesla itself, further preventing Tesla owners from having their EVs serviced by independent repair shops.

182.    The purpose and effect of these statements and policies is to communicate to Tesla EV owners that, in order to maintain warranty coverage, they must purchase all non-covered Tesla Repair Services and Tesla-Compatible Parts from Tesla.

183.    As a direct and proximate result, Plaintiff and the proposed Class have sustained injury to their businesses or property, and as a result have suffered damages.

**PRAYER FOR RELIEF**

184.   WHEREFORE, Plaintiff, on behalf of himself and the proposed Class defined herein, respectfully requests that this Court:

A.   Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff and Plaintiff's attorneys to represent the Class.

B.   Adjudge and decree that misconduct alleged herein violates Sections 1 and 2 of the Sherman Act, and Section 102(c) of the Magnuson-Moss Warranty Act.

C.   Grant injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including, among other things: (i) an order permanently enjoining and restraining Tesla, and its officers, directors, agents, servants, employees, attorneys, and all other persons acting or claiming to act on their behalf from continuing to engage in the wrongful acts described herein; and (ii) requiring Tesla to provide access to manuals, diagnostic tools, and vehicle telematic data, at a reasonable cost, to individuals and independent repair shops.

D.   Award damages to Plaintiff and the Class to the maximum amount allowed, and that judgment in favor of Plaintiff and the Class be entered against Tesla in an amount to be trebled to the extent the laws permit.

E.   Award pre- and post-judgment interest, as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint.

F.   Award Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

G.   Grant such other and further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

185.   Plaintiff hereby demands a trial by jury for all claims so triable.

//

//

//

//

Dated: May 15, 2023

Respectfully submitted,

**SCHNEIDER WALLACE
COTTRELL KONECKY LLP**

By:   */s/ Matthew S. Weiler*

Matthew S. Weiler (SBN 236052)
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
MWeiler@schneiderwallace.com

*Attorney for Plaintiff & the Proposed Class*

38

CLASS ACTION COMPLAINT