1  David R. Marriott (SBN 2682565)
   Noah Joshua Phillips (*pro hac vice*)
2  Vanessa A. Lavely (*pro hac vice*)
   **CRAVATH, SWAINE & MOORE LLP**
3  825 Eighth Avenue
   New York, New York 10019
4  Telephone: (212) 474-1000
   Facsimile: (212) 474-3700
5
   Christopher C. Wheeler (SBN 224872)
6  **FARELLA BRAUN + MARTEL LLP**
   One Bush Street, Suite 900
7  San Francisco, California 94104
   Telephone: (415) 954-4979
8  Facsimile: (415) 954 4480

9  *Counsel for Defendant Tesla, Inc.*

10                 **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12                   **SAN FRANCISCO DIVISION**

13

14  ANDREW RAGONE, individually and on      Case No. 3:23-cv-2352-TLT
    behalf of all others similarly situated,
15                                            Judge:       Honorable Trina L. Thompson
                    Plaintiff,                Hearing Date: September 5, 2023
16          v.                                Hearing Time: 2:00 pm

17  TESLA, INC.,                             **DEFENDANT TESLA, INC.'S**
                                             **MOTION TO DISMISS FOR**
18                  Defendant.               **FAILURE TO STATE A CLAIM**

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. ii

**NOTICE OF MOTION AND MOTION** .............................................................................v

**MEMORANDUM OF POINTS AND AUTHORITIES** ................................................... 1

**PRELIMINARY STATEMENT** ..........................................................................................1

**RELEVANT BACKGROUND** .............................................................................................3

**LEGAL STANDARD** ............................................................................................................3

**ARGUMENT** ...........................................................................................................................3

    I.    The Sherman Act Claims Should Be Dismissed Because Plaintiff Fails To Plead Plausible Relevant Antitrust Markets. .................................................................3

          A.    Plaintiff's Alleged Foremarket Fails. ..........................................................5

          B.    Plaintiff's Alleged Aftermarkets Fail. ........................................................9

    II.    Plaintiff Does Not Plausibly Plead Monopolization and Attempted Monopolization Claims Under Section 2 of the Sherman Act. ............................12

          A.    Plaintiff Has Not Plausibly Alleged Monopoly Power, or a Dangerous Probability of Achieving it, in the Alleged Aftermarkets. ...........................13

          B.    Plaintiff Has Not Plausibly Alleged Any Anticompetitive Conduct. ..........16

    III.    Plaintiff Does Not Plausibly Allege a Tying Claim Under Section 1 of the Sherman Act. .....................................................................................................19

          A.    Plaintiff Has Not Plausibly Alleged a Tie. ................................................20

          B.    Plaintiff Has Not Plausibly Pleaded Market Power in the Alleged Tying Markets.....21

          C.    The Complaint Provides No Plausible Basis for *Per Se* or "Quick Look" Review of the Section 1 Claim. ...................................................................22

    IV.    Plaintiff's Sherman Act Claims are Economically Implausible. .........................23

    V.    Plaintiff Fails To State a Claim Under § 102 of the Magnuson-Moss Warranty Act. .........23

          A.    Plaintiff Fails To Satisfy Two Preconditions To Bringing a Magnuson-Moss Claim.................................................................................................23

          B.    Plaintiff Has Not Plausibly Alleged that Tesla's Warranty Violates the Statute.........24

    VI.    Plaintiff Has Not Adequately Pleaded Article III Standing................................24

**CONCLUSION** ......................................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ....................................passim

*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991) ..........................................18

*Allied Orthopedic Aplliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991 (9th Cir. 2010)................19

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008)...............................................4, 7, 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................................3

*Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016) ...................................................4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................................23

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ..........................................................17

*California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011)...........................................22

*California v. Texas*, 141 S. Ct. 2104 (2021) ...........................................................................................25

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495 (9th Cir. 2010)..........................23

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)...........................................................................25

*Dream Big Media Inc. v. Alphabet Inc.*, No. 22-CV-02314-JSW, 2022 WL 16579322 (N.D.
   Cal. Nov. 1, 2022)............................................................................................................................20, 21

*Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022) ....................................13, 16, 17

*DSM Desotech, Inc. v. 3D Sys. Corp.*, 749 F.3d 1332 (Fed. Cir. 2014) .................................................5

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)...................................9, 20

*Eastman v. Quest Diagnostics, Inc.*, 108 F. Supp. 3d 827 (N.D. Cal. 2015).........................................15

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in part and rev'd
   in part*, 67 F.4th 946 (9th Cir. 2023)...........................................................................................passim

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023)........................................................passim

*Epicor Software Corp. v. Alt. Tech. Sols., Inc.*, No. 13-00448, 2013 WL 12130024 (C.D.
   Cal. Dec. 2, 2013) .................................................................................................................................14

*Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027 (9th Cir. 2020) ..........................................................24

*Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495 (1969) ...........................................................22

*Free Freehand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171 (N.D. Cal. 2012) ................................18

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ................................................................12

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)................................................................3, 16

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)................................................................7

*Gerling v. Amazon.com Inc.*, 526 F.3d 1253 (9th Cir. 2008)................................................................25

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)................................................................5, 12

*In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027 (N.D. Cal. 2008)................................................................17

*In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745 (N.D. Cal. 2020) (Breyer, J.),
    *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) ................................4, 5, 7, 8

*In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967 (N.D. Cal. 2020), *aff'd*, No.
    20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) ................................................................8

*Kaplan v. Burroughs Corp.*, 611 F.2d 286 (9th Cir. 1979) ................................................................8

*Klein v. Facebook Inc.*, 580 F. Supp. 3d 743 (N.D. Cal. 2022)................................................................8

*Maronyan v. Toyota Motor Sales, Inc.*, 658 F.3d 1038 (9th Cir. 2011) ................................................................23

*MLW Media LLC v. World Wrestling Ent., Inc.*, No. 22-CV-00179-EJD, 2023 WL 1975241
    (N.D. Cal. Feb. 13, 2023)................................................................4

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008) ................................................................5, 10, 19

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ................................................................3

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 16-cv-06370, 2017 WL 4310767 (N.D.
    Cal. Sept. 28, 2017)................................................................14, 15

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438 (2009) ................................................................18

*Patterson v. RW Direct, Inc.*, No. 18-cv-00055-VC, 2018 WL 6106379 (N.D. Cal. 2018)................................................................24

*PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-04689, 2014 WL 2987322 (N.D. Cal. July 2,
    2014) ................................................................19

*PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997)................................................................4

*PSKS, Inc. v. Leegin Creative Prods.*, 615 F.3d 412 (5th Cir. 2010) ................................................................12

*RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215 (C.D. Cal. 2012)................................................................21

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)................................................................9

*Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal. 2022)....................................................5, 12

*Reveal Chat Holdco, LLC. v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020)..........................13

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963 (9th Cir. 2008) ......................................21

*Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160 (N.D. Cal. 2013) ..............................................................22

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11 (1st Cir. 1999) ...................................5

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) ........................................................................3, 14

*Spectrum Sports v. McQuillan*, 506 U.S. 447 (1993) ............................................................................13

*Streamcast Networks v. Skype Techs., SA*, 547 F. Supp. 2d 1086 (C.D. Cal. 2007)................................9

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ............................................................................25

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001) .....................................................................4

*Terminalift LLC v. Int'l Longshore and Warehouse Union Local 29*, No. 11-1999, 2013 WL 2154793 (S.D. Cal. May 17, 2013) ...............................................................................................14

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ...........................................................................25

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ..........................................................17

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004).................................................8

*Univ. Grading Serv. v. eBay, Inc.*, No. C-09-2755, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) .............17

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398 (2004)....................................16

**Statutes & Rules**

15 U.S.C. § 2302.............................................................................................................................23, 24

15 U.S.C. § 2310.............................................................................................................................23, 24

16 C.F.R. § 700.10(c) ...........................................................................................................................24

Areeda & Hovenkamp, Antitrust Law ¶ 1740a ......................................................................................4

Fed. R. Civ. P. 12 ...................................................................................................................................v

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on September 5, 2023 at 2:00 pm, or as soon thereafter as the matter may be heard, in Courtroom 9 of the United States United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Hon. Trina L. Thompson, Defendant Tesla, Inc. will and hereby does move the Court to dismiss Plaintiff Andrew Ragone's Complaint. Specifically, this Motion seeks to dismiss the Complaint in its entirety for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and lack of Article III standing pursuant to Fed. R. Civ. P. 12(b)(1). This Motion is supported by: this Notice of Motion and Motion; a Memorandum of Points and Authorities; the accompanying Request for Judicial Notice and Incorporation by Reference; the Declaration of Vanessa A. Lavely ("Lavely Decl."); the [Proposed] Order filed herewith; other previously and concurrently filed documents in this action, the Court's files, the arguments of counsel, and any other matter that the Court may properly consider.

The issues to be decided are:

1.    Whether the Court should dismiss Plaintiff's claims brought under Sections 1 and 2 of the Sherman Act (Counts I-V), where Plaintiff fails to plead (i) any cognizable antitrust market, (ii) that Tesla has monopoly power in any market, and (iii) any actions that constitute anticompetitive conduct; and where Plaintiff's claims are economically implausible.

2.    Whether the Court should dismiss Plaintiff's claim brought under Section 102 of the Magnuson-Moss Warranty Act (Count VI), where Plaintiff fails to allege that he satisfied the necessary procedural preconditions and failed to show that Tesla's warranties violate the statute.

3.    Whether Plaintiff's claims should be dismissed for lack of Article III standing, where Plaintiff fails to allege particularized, concrete harm caused by Defendant.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Plaintiff's Complaint advances purported class action antitrust claims, based on judicially disfavored theories that fail at every step: Plaintiff does not allege any cognizable antitrust market, monopoly power, anticompetitive conduct, any "tie," or Article III standing. Plaintiff (a Tesla owner) claims that Tesla violated Sections 1 and 2 of the Sherman Act and Section 102 of the Magnuson-Moss Warranty Act by (1) "discouraging" the use of non-Tesla repair shops and parts through the terms of the car's warranty; (2) designing cars so that maintenance and repair require information and tools "exclusively accessed by Tesla"; and (3) "limiting access" to diagnostic and repair resources and parts. Plaintiff's claims depend on gerrymandered "markets," conclusory and unsupported allegations of market power, and a mischaracterization of Tesla's warranties and practices. But Plaintiff's allegations actually undercut his claims, showing that the alleged foremarket is highly competitive and not limited to electric vehicles ("EVs"), the alleged aftermarkets are not cognizable, and Tesla's challenged warranties and practices are perfectly lawful. Plaintiff's claims should be dismissed for multiple reasons.

*First*, Plaintiff fails to plausibly allege any cognizable relevant antitrust market, which should result in dismissal of all the Sherman Act claims. The Complaint asserts the existence of an EV-only "foremarket." Yet the Complaint and the documents it cites acknowledge that EVs compete with various non-EVs. (Section I.A.) As Tesla CEO Elon Musk stated in 2014 (and has reiterated many times since), "Our true competition is not the small trickle of non-Tesla electric cars being produced, but rather the enormous flood of gasoline cars pouring out of the world's factories every day."[1] Plaintiff also does not come close to plausibly pleading the rare and judicially disfavored single-brand "aftermarket" in either Tesla parts or Tesla repair services. (Section I.B.)

*Second*, Plaintiff's claims under Section 2 of the Sherman Act that Tesla is monopolizing or attempting to monopolize the alleged aftermarkets fail for the independent reasons that Plaintiff does not establish Tesla's purported monopoly power in the alleged aftermarkets, or a dangerous probability of achieving it. Monopoly power means the long-term ability to control prices or exclude rivals. The Complaint, however, does not specify any market shares, much less at the scale needed to plead

---

[1] Lavely Decl. Ex. F (Tesla official website regarding patents).

1  monopoly power. Nor does it provide any allegations to support the exercise of monopoly power or

2  barriers to entry that would be required to sustain it. And Plaintiff concedes that consumers have

3  options, access to repair resources is expanding, and prices are dropping—the opposite of monopoly

4  conditions. (Section II.A.)

5  Plaintiff also has not sufficiently alleged any anticompetitive conduct. The Complaint must

6  allege facts plausibly showing that Tesla's alleged monopoly power in the alleged aftermarkets was

7  achieved through intentionally exclusionary or predatory conduct that harmed the competitive process.

8  Plaintiff focuses on conduct that is not remotely anticompetitive, such as Tesla having warranty terms

9  consistent with federal law, offering *free* access to Tesla's service manuals and parts catalog, charging a

10  modest fee (consistent with industry standards) for certain diagnostic software, and having an exclusive

11  agreement with one supplier. Competing EV makers (Rivian and Lucid Motors) impose "similar

12  restraints." (Section II.B.)

13  *Third*, Plaintiff's Section 1 claim fails for the independent reasons that the Complaint does not

14  sufficiently allege any "tie" or market power in any of the alleged "tying" markets. Plaintiff tries to

15  plead multiple alleged ties in multiple directions: (1) EVs as the tying product with Tesla parts and/or

16  repair services as the tied products; (2) Tesla parts as the tying product with Tesla repair services as the

17  tied product; and (3) Tesla repair services as the tying product with Tesla parts as the tied product.

18  Plaintiff sketches out this pretzel but pleads no tie anywhere in it. Entirely absent are plausible

19  allegations of conditionality, an essential element of any tie. Here again, the allegations contradict

20  themselves—Plaintiff acknowledges that Tesla's warranties are not conditioned on obtaining parts or

21  services only from Tesla and that consumers can (and do) go to third parties for "cheap" repairs.

22  (Section III.A.) Plaintiff also fails to plausibly plead that Tesla has the requisite antitrust market power

23  in any of the alleged "tying" markets. (Section III.B.)

24  *Fourth*, an antitrust claim must be plausible in light of basic economic principles. All of

25  Plaintiff's antitrust claims fail on this requirement as well. (Section IV.)

26  *Fifth*, Plaintiff's Magnusson-Moss Warranty Act claim fails because the statute prohibits only

27  warranties that condition their validity on the use of authorized repair services or replacement parts. By

28  the express terms of Tesla's warranty (quoted in the Complaint), there is no such condition. (Section V.)

*Sixth*, Plaintiff has not shown Article III standing to assert any of his claims. (Section VI.)

The Court should not permit Plaintiff to proceed into protracted class action discovery based on disfavored antitrust theories and implausible, unsupported allegations. His claims should be dismissed.

## RELEVANT BACKGROUND

Tesla is an automotive and clean energy company. (Compl. ¶ 10.) Tesla designs, manufactures, and sells high-performance EVs. (*Id.* ¶¶ 10, 12.) It also designs and manufactures parts for its EVs and runs service centers that provide repair and maintenance services for its EVs. (*Id.* ¶¶ 12-13.) Tesla offers significant resources and support for owners of its EVs to repair and maintain their vehicles, including by making its parts catalog and service repair manuals free and available online. (*Id.* ¶ 82.)

Plaintiff purports to be a Tesla vehicle owner who claims to have paid Tesla for Tesla-compatible parts "and/or" Tesla repair services between March 2019 and the present. (*Id.* ¶¶ 9, 126.) Plaintiff does not specify which parts (if any) he purchased, what specific services (if any) he purchased, or under what Tesla vehicle warranties (if any) his vehicle(s) are or were covered.

Additional relevant facts are set forth in the Argument section below.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "[I]nsistence on specificity of facts is warranted before permitting a case to proceed into costly and protracted discovery in an antitrust case." *Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013). "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action." *Id.* at 959-60 (quotations omitted).

## ARGUMENT

**I.    The Sherman Act Claims Should Be Dismissed Because Plaintiff Fails To Plead Plausible Relevant Antitrust Markets.**

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition'" in which the challenged conduct supposedly has harmed competition. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express*

3

*Co.*, 138 S. Ct. 2274, 2285 (2018)).[2] "A [relevant] market comprises any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel could profitably raise prices above a competitive level." *Epic*, 67 F.4th at 975. "If the sales of other producers could substantially constrain the price-increasing ability of the monopolist or hypothetical cartel, these other producers must be included in the market." *Id.* (quotations omitted). Put differently, if sellers outside the alleged market put competitive pressure upon those inside it, the market is not plausibly alleged. Though it is possible to have relevant submarkets within a broader relevant market, a submarket is cognizable only where it is plausibly shown to be "meaningfully insulated from competition with other products in the broader market." *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 756 (N.D. Cal. 2020) (Breyer, J.), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (quotations omitted). Failure to plead a plausible relevant antitrust market on these terms is grounds for dismissal of the Sherman Act claims. *See id.*; *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001); *MLW Media LLC v. World Wrestling Ent., Inc.*, No. 22-CV-00179-EJD, 2023 WL 1975241, at *2 (N.D. Cal. Feb. 13, 2023).

Plaintiff claims that Tesla restrained competition in single-brand aftermarkets for "Tesla-Compatible Parts" and "Tesla Repair Services," deriving from an EV-only "foremarket." (Compl. ¶¶ 1, 19.) But "[s]ingle-brand markets are, at a minimum, extremely rare and courts have rejected such market definitions even where brand loyalty is intense" so as not to transform every unique brand into a monopoly. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1021 (N.D. Cal. 2021) (quotations omitted), *aff'd in part and rev'd in part*, 67 F.4th 946 (9th Cir. 2023). "[I]t is an understatement to say that single-brand markets are disfavored." *Id.* (quotations omitted); Areeda & Hovenkamp, Antitrust Law ¶ 1740a (explaining that single-brand aftermarkets are cognizable only in narrow circumstances). This Circuit and others have repeatedly rejected antitrust claims based on single-brand aftermarkets.[3]

---

[2] In *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 n.6 (9th Cir. 2023), the Ninth Circuit noted that a precisely defined market is not required in two limited categories of antitrust cases: those subject to the *per se* rule (such as price-fixing cases), and those applying a "quick look" liability standard. Plaintiff does not dispute that his Section 2 claims are subject to the "rule of reason" for which a cognizable relevant market is essential, nor could he. And, as explained below (Section III.C), he offers no basis for *per se* or quick-look treatment of his Section 1 tying claim.

[3] *See, e.g.*, *Epic Games*, 67 F.4th at 981; *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *Avaya*

---

4

Plaintiff comes nowhere close to pleading the "rare" and judicially "disfavored" cognizable single-brand aftermarket. *First*, because an aftermarket is "wholly derivative from and dependent on" a foremarket, *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022), Plaintiff cannot establish his alleged aftermarkets without plausibly alleging a cognizable relevant "foremarket." The alleged EV-only foremarket is not plausibly pleaded so the Complaint fails at this foundational step. (Section I.A.) *Second*, regardless of the plausibility of the foremarket, Plaintiff must plead facts demonstrating the additional required criteria for aftermarket claims. Plaintiff's claims fail here as well. (Section I.B.)

### A.    Plaintiff's Alleged Foremarket Fails.

Plaintiff's alleged EV-only foremarket (Compl. ¶ 19) is implausible for various reasons.

Another court in this district dismissed market definition allegations strikingly similar to Plaintiff's allegation of an EV-only foremarket. *German Auto.*, 497 F. Supp. 3d at 757. In *German Auto.*, too, the plaintiffs asserted a market limited to a specific automobile type—there, diesel passenger vehicles. Noting that "[j]udicial experience and common sense help determine whether a submarket is insulated from competition in the relevant sense," the court in *German Auto.* observed that the plaintiffs' alleged market "simply defies common sense" because it depended on the implausible proposition that "other vehicles, including other purportedly environmentally friendly vehicles, lack the potential ability to deprive diesel passenger vehicles of significant levels of business." *Id.* at 757 (quotations omitted).

Where consumers can and do substitute between products, there is competition and the market must include those substitutes. *Id.* at 759; *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121-23 (9th Cir. 2018). The *German Auto.* court found that the plaintiffs had "not plausibly alleged any genuine barrier to customer cross-over between diesel passenger vehicles and other passenger vehicles," and that they failed to plead facts sufficient to "overcome the commonsense inference that diesel passenger vehicles compete with other passenger vehicles." 497 F. Supp. 3d at 757. For these reasons, the court concluded that "[d]iesel passenger vehicles do not constitute a relevant market because that market would exclude obvious 'economic substitutes.'" *Id.* at 756-57 (quoting *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

---

*Inc., RP v. Telecom Labs, Inc.,* 838 F.3d 354, 405 (3d Cir. 2016); *DSM Desotech, Inc. v. 3D Sys. Corp.,* 749 F.3d 1332, 1346 (Fed. Cir. 2014); *SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999).

Like the alleged "diesel-only" market in *German Auto.*, Plaintiff's EV-only foremarket depends on the contention that other types of cars do not meaningfully compete with EVs, which "simply defies common sense." Indeed, the Complaint includes facts that directly undermine Plaintiff's foremarket theory, including that (1) EVs compete in a "worldwide automotive market," (2) that market is "highly competitive," and (3) EVs face competition "from other types of alternative fuel vehicles, plug-in hybrid electric vehicles and high fuel-economy internal combustion engine vehicles."[4] And Plaintiff does not allege any "genuine barrier" to customers crossing over between EVs and other types of vehicles.

Tesla has been a pioneer in the development of EVs. (Compl. ¶¶ 65-69.) Its mission is to "accelerate the advent of sustainable transport."[5] By definition, that requires Tesla to attract consumers who currently drive non-EVs, the vast majority of car-driving consumers. As Elon Musk previously explained, "Our first product was going to be expensive no matter what it looked like, so we decided to build a sports car, as that seemed like it had the best chance of *being competitive with its gasoline alternatives*."[6] (*Id.* ¶ 70.) As part of its core mission, Tesla has promoted competition, including by not enforcing its patents.[7] And other companies have "increased their EV product offerings" (*id.* ¶ 24), including large incumbent automakers such as Ford and Chevy (*id.* ¶ 111), as well as new entrants such as Rivian and Lucid Motors (*id.* ¶ 31). Tesla's share of sales within the alleged EV market has dropped more than 18% within the past three years (*id.* ¶ 24), largely due to competition *encouraged* by Tesla.

The few allegations Plaintiff offers to try to support the alleged foremarket are nowhere near enough to "overcome the commonsense inference" that EVs compete with other cars:

*"EV Market" References*: Plaintiff contends that Tesla "acknowledges that EVs are a separate product market by consistently promoting 'the development of the electric vehicle market'" and touting "the superiority and 'attractiveness'" of its vehicles compared to the internal combustion vehicle ("ICE") market. (Compl. ¶ 20.) But Tesla promotes those qualities of EVs compared to ICE vehicles precisely *because* they compete. And the SEC filing on which Plaintiff relies is replete with statements

---

[4] *See* Lavely Decl. Ex. A (Tesla 2021 Form 10-K at 11) (cited in Compl. ¶¶ 20 n.11, 69 n.47, 71 n.51); *see also* Request for Judicial Notice and Incorporation by Reference.

[5] Lavely Decl. Ex. G (Tesla official website regarding company mission).

[6] *Id.*

[7] Lavely Decl. Ex. F (Tesla official website regarding patents).

that EVs compete with non-EVs in a highly competitive market.[8] That Tesla compares its EVs to ICE vehicles "is a sign of competition, not a lack thereof." *Psystar Corp.*, 586 F. Supp. 2d at 1199. Tesla's occasional use of the phrase "electric vehicle market" says "nothing about whether that segment was insulated from competition with other vehicles." *German Auto.*, 497 F. Supp. 3d at 757 (citation omitted). The allegation shows only that electric vehicles "are a thing" that can be "address[ed] by name." *Id.* (quotation omitted).

*EV Study*: Plaintiff cites one purported finding in a study of EV owners (Compl. ¶ 21), but he fails to mention another finding in the same study: 78% of respondents reported owning non-EVs as a second car. Even based on Plaintiff's own citations, EV owners do not limit their purchases to only EVs.[9] The study also says nothing about whether EV owners would switch to another car type in response to a significant price increase relative to other vehicle options. Nor does it address the views of prospective car buyers who do not own an EV, the vast majority of car-buying consumers. Plaintiff observes that adoption of EVs "has accelerated dramatically" (Compl. ¶ 70), but omits the fact that EVs have only a "5% share" of U.S. vehicle sales, confirming that EVs face significant competition from other cars.[10]

*"Unique" EV Attributes*: Plaintiff suggests EVs are in their own market because they supposedly have "unique attributes"—"the ability to comfortably transport multiple individuals to specific destinations, located many miles apart, with zero carbon emissions." (Comp. ¶ 19.) As pleaded, Plaintiff establishes mere product differentiation. Relevant markets often include differentiated products, reflecting the reality that many differentiated products across the economy compete with one another. *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015) ("A product market includes *all* goods that are reasonable substitutes, even though the products themselves are not entirely the same." (emphasis

---

[8] *See, e.g.*, Lavely Decl. Ex. A (Tesla 2021 Form 10-K at 11) ("Model S and Model X [vehicles] compete primarily with premium sedans and premium SUVs and Model 3 and Model Y [vehicles] compete with small to medium-sized sedans and compact SUVs, which are extremely competitive markets"; (ii) Tesla's EVs face competition "from other types of alternative fuel vehicles, plug-in hybrid electric vehicles and high fuel-economy internal combustion engine vehicles"; and (iii) competing products "typically include internal combustion vehicles from more established automobile manufacturers.").

[9] *See* Lavely Decl. Ex. D (article regarding EV purchaser habits) (cited in Compl. ¶ 21 n.12).

[10] Lavely Decl. Ex. E (article regarding EV sales) (cited in Compl. ¶ 70 n.49).

1    added)).  Convertible cars enable comfortable travel without a roof but they still compete with hard top

2    cars. Plaintiff fails to "explain why products without" the zero carbon emission characteristic "are not

3    reasonably interchangeable" with EVs, nor could he plausibly. *Klein v. Facebook Inc.*, 580 F. Supp. 3d

4    743, 766 (N.D. Cal. 2022). As this Court noted in one of the *German Auto.* matters, "It is implausible

5    that . . . a buyer looking at a [non-EV] Mercedes would not consider a Tesla if it were cheaper or of

6    higher quality." *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 980 (N.D. Cal. 2020),

7    *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021).

8         *SSNIP Test*: Plaintiff contends that his alleged foremarket is supported by the "SSNIP test,"

9    which some courts have used to assess the boundaries of markets when empirical data on consumer

10   demand is available to conduct the test.[11] (Compl. ¶ 22.) The SSNIP allegations are woefully inadequate.

11        Plaintiff contends that EVs "cost more than their similarly equipped, ICE-vehicle counterparts."

12   (*Id.* ¶ 23.) But as courts have recognized, "a mere price differential alone does not necessarily signal a

13   distinct market." *Psystar Corp.*, 586 F. Supp. 2d at 1198; *see also Kaplan v. Burroughs Corp.*, 611 F.2d

14   286, 292 (9th Cir. 1979) ("[P]rice differential alone does not govern the scope of the relevant market.").

15        Plaintiff also contends that "from January to May 2022, EV prices [reportedly] jumped 22%

16   while non-EV motor vehicle prices increased only 14%." (Compl. ¶ 23.) But a rise in EV prices, in

17   percentage terms, compared to *all* non-electric vehicles (not just energy efficient vehicles with

18   comparable features) plainly says nothing about whether a SSNIP on EVs would be profitable. *See*

19   *German Auto.*, 497 F. Supp. 3d at 757 (rejecting a similar attempt to rely on "a general 'price premium'

20   for diesel vehicles without reference to comparable premiums for other environmentally friendly

21   vehicles"). Moreover, a relative rise in prices over five months is far from "non-transitory." *See United*

22   *States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1112 (N.D. Cal. 2004) (the non-transitory requirement of

23   a SSNIP means "lasting for the foreseeable future").

24        Finally, Plaintiff says the SSNIP test is met because Tesla has been able to increase prices while

25

26        [11] The SSNIP test asks whether a hypothetical monopolist of the proposed market could "profitably
     make a small but significant non-transitory increase in price"; if the empirical data show that consumers
27   would "respond to a SSNIP by making purchases outside the proposed market definition, thereby
     rendering the SSNIP unprofitable, then the proposed market definition is too narrow" and must be
28   expanded to include other economic substitutes of the defendant's product. *Epic*, 67 F.4th at 975.

increasing sales. (Compl. ¶ 23.) Yet Plaintiff concedes that Tesla has decreased prices (*id.*),[12] and that Tesla's share of EV sales has declined (*id.* ¶ 24). Plaintiff also pleads no facts to support the inference that the alleged rise in Tesla prices reflects market power rather than, for example, supply constraints, new features, quality improvements, inflation, or any other factors that can impact pricing and have nothing to do with market power. A price increase driven by these factors, which the Complaint does not rule out, would have no bearing on the question of whether a monopolist could profitably impose a SSNIP on EVs. *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995). Plaintiff's vague and conclusory pricing allegations fail to provide a plausible basis for his SSNIP claim.

Plaintiff's Sherman Act claims, which all rely on the inadequate foremarket pleading, fail.

## B. Plaintiff's Alleged Aftermarkets Fail.

Because Plaintiff has not pleaded a plausible foremarket, the alleged aftermarkets fail. *Epic*, 559 F. Supp. 3d at 955 ("Given the Court's rejection of the foremarket theory, the aftermarket theory fails as it is tethered to the foremarket."). Plaintiff's aftermarket allegations fail for the additional reason that they do not plausibly plead the factors required to establish a single-brand aftermarket.

In *Eastman Kodak Co. v. Image Technical Services, Inc.*, the U.S. Supreme Court held that a cognizable relevant aftermarket can exist in certain limited circumstances where the facts demonstrate that customers are unknowingly "locked in" to the aftermarket "such that competition in the foremarket cannot 'discipline [competition in] the aftermarkets.'" *Epic*, 67 F.4th at 976-77 (quoting *Kodak*, 504 U.S. 451, 486 (1992)). *Kodak* involved a foremarket of photocopiers and an aftermarket for replacement parts and servicing of Kodak-brand photocopiers. Since then, "[c]ourts have been extremely reluctant to . . . extend [single-brand aftermarket theories] to other types of goods," *Streamcast Networks v. Skype Techs., SA*, 547 F. Supp. 2d 1086, 1094-95 (C.D. Cal. 2007).

The Ninth Circuit recently affirmed a decision of this Court rejecting single-brand aftermarket claims in the context of cell-phone app stores. *See Epic*, 67 F.4th at 981. The Ninth Circuit confirmed what a plaintiff must show to sustain a single-brand aftermarket: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant'

---

[12] And Plaintiff ignores that Tesla recently disclosed reduced prices to the market in 2023. *See, e.g.*, Lavely Decl. Ex. B (Tesla Mar. 2023 Form 10-Q at 26).

1   information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary

2   switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand

3   do not undermine the proposed single-brand market." *Id.* at 977.  Each of these criteria must be

4   established to plead a cognizable single-brand aftermarket.[13] Plaintiff fails on each one.

5       <u>No General Knowledge</u>: Without the "crucial" showing that "the challenged aftermarket

6   restrictions are 'not generally known' when consumers make their foremarket purchase," there is an

7   "economic presumption" that "consumers make a knowing choice to restrict their aftermarket options"

8   when they make their foremarket purchase. *Id.* at 976, 977-78 (citing *Newcal*, 513 F.3d at 1050).

9       Plaintiff does not even attempt to establish this "crucial" requirement. The Complaint lacks any

10  factual allegation that Tesla purchasers are not generally aware of the alleged aftermarket restrictions.

11  To the contrary, Plaintiff alleges that the supposed "shortcomings in Tesla service" (and other alleged

12  restrictions) "are widely documented." (Compl. ¶ 107.) For example, he alleges: (i) Tesla's SEC filings

13  state that it designs its vehicles to "effectively limit[] anyone other than Tesla from being able to provide

14  maintenance and repair services for its EVs" (Compl. ¶¶ 78-80); (ii) Elon Musk tweeted[14] that Tesla's

15  service locations in North America "have major gaps in geographic coverage!" (*id.* ¶ 106); (iii) Tesla's

16  owner's manual advises, "Use only genuine Tesla parts and accessories" (*id.* ¶ 91); (iv) Tesla's warranty

17  "strongly discourage owners from obtaining parts or services anywhere else, or risk voiding their

18  warranties" (*id.* ¶ 86); (v) online forums are "replete with stories by Tesla owners of Tesla invalidating

19  warranties" and "widely discussed" defects (*id.* ¶¶ 92, 115); (vi) Tesla's 2014 and 2015 SEC filings

20  disclosed that Tesla purchases some EV components from a single source (allegedly to restrict the

21  availability of Tesla parts) (*id.* ¶¶ 97-100); and (vii) Tesla's online catalog reveals the supposedly

22  inflated prices of Tesla vehicle parts (*id.* ¶ 111).

23      Plaintiff cannot have it both ways. Either the alleged restrictions are not actually aftermarket

24  restrictions, or they are generally known to consumers (as demonstrated through Plaintiff's own

---

25  [13] Plaintiff seems to suggest that he can avoid pleading the lock-in factors based on his claim that

26  Tesla has monopoly power in the alleged EV-only foremarket. (Compl. ¶ 30.) That is wrong. A plaintiff

27  "must" establish each lock-in factor to show a cognizable relevant aftermarket—the Ninth Circuit did

    not identify any exceptions in *Epic*.

28  [14] *See* Lavely Decl. Ex. C (Tesla Nov. 2013 Form 8-K at 1) (disclosing to the market that Musk's

    Twitter account is an official Tesla communication).

1  allegations). Either dooms Plaintiff's claims.

2         Plaintiff's claims are not saved by the allegation that Tesla "misleadingly tells consumers that its

3  EVs are specifically designed to require little or no maintenance" (*id.* ¶ 29) and that "its EVs have fewer

4  moving parts that could [possibly] need to be replaced" (*id.* ¶ 39). Supposedly telling consumers that

5  EVs are *designed* to require little or no maintenance and have *fewer* moving parts plainly does not speak

6  to what options are available and from whom, if and when maintenance and parts are required.[15]

7         *Information Costs*: As *Epic* makes clear, in addition to showing no general knowledge, a plaintiff

8  also must show that information costs prevent accurate life-cycle pricing. 67 F.4th at 977. Here, too,

9  Plaintiff's allegations contradict the required showing. For example, Plaintiff asserts that (i) Tesla's

10 publicly available parts catalog discloses the cost of Tesla parts (*id.* ¶ 111), (ii) the purported hourly rate

11 for Tesla Repair Services is documented in blog posts (*id.* ¶¶ 107-109); and (iii) public sources disclose

12 the "average cost to maintain a Tesla EV . . . per year" (*id.* ¶ 112).

13        *Switching Costs*: Switching costs are "the costs born by leaving one platform to go to a different

14 platform." *Epic*, 559 F. Supp. 3d at 956 n.254. Plaintiff does not identify any such costs. Based on the

15 allegation that "the cost of an EV is considerably higher than the cost of an individual maintenance or

16 repair service," Plaintiff leaps to the conclusion that "it is not economically feasible for a Tesla EV

17 owner to switch to a different EV in order to avoid the high prices and low supply of Tesla Repair

18 Services." (Compl. ¶ 30.) Although true that buying a new car costs more than repairing a car, that says

19 nothing about the cost of switching from a Tesla to a different vehicle. Consumers sell their cars for a

20 range of reasons. Plaintiff does not identify a basis to infer that a Tesla owner who is unhappy with the

21 available repair options would find it uneconomical to sell her car and take her business elsewhere.

22        *General Market Definition Principles*: Even where an aftermarket satisfies all of the above

23 criteria, it still "must bear the 'practical indicia' of an independent economic entity in order to qualify as

24 a cognizable" market, based on "general market-definition principles regarding cross-elasticity of

---

25

26     [15] Nor are the statements misleading as pleaded. With regard to the claim that EVs are designed to require little or no maintenance, the actual statement from Tesla (quoted in the Complaint) is that Tesla vehicles are designed with the "goal of eliminating the need for service." (Compl. ¶ 76.) The statement

27 is plainly aspirational, not a promise of "no maintenance" (which would be facially unbelievable). With regard to the statement about "fewer moving parts," the Complaint does not even allege that it is

28 untrue—it is silent on whether EVs actually have more or fewer moving parts than ICE vehicles.

demand." *Epic*, 67 F.4th at 977. Plaintiff's aftermarket allegations fail here as well.

*First*, Plaintiff has not described the alleged aftermarkets with nearly the degree of specificity required to establish them under such principles. Indeed, as to the make-up of the alleged aftermarkets, the Complaint merely alleges that they comprise "the various parts" and "various services" used to "repair and maintain Tesla EVs," so long as they are not covered under warranty. (Compl. ¶¶ 26, 38.) As pleaded, there is no way to know what specific services or parts are included (or not) in the alleged aftermarkets; and there is no way to know whether the alleged aftermarkets encompass the products that a consumer might substitute for repairs or parts they might need, as *Epic* requires.

*Second*, Plaintiff has not plausibly established the geographic component of his alleged aftermarkets. A market includes both a product market and a geographic market, which must be defined by the area "where buyers can turn for alternative sources of supply." *Reilly*, 578 F. Supp. 3d at 1109 (quotations omitted). Plaintiff asserts that the relevant geographic market for its alleged aftermarkets is the United States, (Compl. ¶ 46), but he fails to plead the breadth of the geographic market, which warrants dismissal. *See Reilly*, 578 F. Supp. 3d at 1109. For the alleged parts aftermarket, Plaintiff asserts that "American Tesla owners do not and would not turn to parts manufactured for sale outside the United States due to shipping costs" and "differing regulatory requirements." (Compl. ¶ 48.) There is no support for why these are impediments. For the alleged services market, Plaintiff does not explain how repair services in distant parts of the country are competitive substitutes with each other.[16] *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004); *PSKS, Inc. v. Leegin Creative Prods.*, 615 F. 3d 412, 418 (5th Cir. 2010) (rejecting market as "too broad and vague . . . to constitute a market").

Plaintiff's alleged single-brand aftermarket claims should be dismissed for the independent reason that they fail to "encompass all interchangeable substitute products." *Hicks*, 897 F. 3d at 1123.

## II.    Plaintiff Does Not Plausibly Plead Monopolization and Attempted Monopolization Claims Under Section 2 of the Sherman Act.

Plaintiff contends that Tesla monopolized, or attempted to monopolize, the alleged Tesla-

---

[16] For example, Plaintiff asserts that "cost and wait times associated with moving vehicles and parts back and forth" prevents repair services outside the U.S. from competing with repair services inside the U.S. (Compl. ¶ 49), but does not explain why those same factors do not prevent repair services in California from competing with repair services in New Jersey.

Compatible Parts and Tesla Repair Services aftermarkets in violation of Section 2 of the Sherman Act. To prevail on a motion to dismiss, a plaintiff pleading monopolization must establish that the defendant has monopoly power in a relevant market and that it secured or maintained that monopoly power through exclusionary conduct, not competition on the merits. *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137-38 (9th Cir. 2022). Attempted monopolization requires that the defendant have a dangerous probability of achieving monopoly power in the relevant market and that it engaged in the conduct with the intent to monopolize. *Reveal Chat Holdco, LLC. v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1000-03 (N.D. Cal. 2020).

Even if Plaintiff had sufficiently pleaded the alleged aftermarkets (and he has not, *see* Section I.B), Plaintiff's Section 2 claims fail for two independent reasons: (1) Plaintiff has not plausibly alleged that Tesla has monopoly power or a dangerous probability of achieving it in the alleged aftermarkets; and (2) Plaintiff has not plausibly alleged anticompetitive conduct.

### A.    Plaintiff Has Not Plausibly Alleged Monopoly Power, or a Dangerous Probability of Achieving it, in the Alleged Aftermarkets.

Plaintiff's Section 2 claims fail because they do not sufficiently allege monopoly power or attempted monopoly power in the alleged aftermarkets. "Monopoly power" means a "substantial" or "extreme degree" of market power. *Epic*, 559 F. Supp. at 1028. Whereas market power is "the ability to raise prices above those that would be charged in a competitive market," monopoly power means "the power to control prices or exclude competition." *Id.* Such power must be "durable and sustaining" to constitute monopoly power. *Id.* A "dangerous probability" of achieving monopoly power means that the defendant holds a position so proximate to monopoly that the challenged conduct threatens success. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 455-56 & n.7 (1993).

The Complaint recites the definition of monopoly power without pleading any specific facts to show that Tesla possesses it, or is dangerously close to possessing it, in the alleged aftermarkets. If anything, the Complaint undercuts Plaintiff's monopoly power claim. For example, Tesla's parts catalog and service repair manuals *are free and available online*. (Compl. ¶ 82.) Tesla also provides diagnostic software that customers can use to address their most common repair and maintenance needs, and it does

so for free, without a subscription, and directly embedded into the vehicle's touchscreen.[17] Those are plainly not actions of a company with the ability and intent to control prices and exclude rivals in the alleged aftermarkets. *Somers*, 729 F.3d at 964 (dismissing Section 2 claim where plaintiff's "own allegations do not square with her [monopolization] theory").

The Complaint also says nothing specific about Tesla's supposed share of the alleged aftermarkets or the shares of Tesla's supposed aftermarket rivals (independent and do-it-yourself repairers). The Complaint acknowledges that non-Tesla options exist for both services and parts but only vaguely describes them—"some basic maintenance-related parts" are available from third parties (Compl. ¶ 44); a small handful of independent repair shops have "apparently engineered an inexpensive fix" for a small leak in Tesla rear-drive units (*id.* ¶ 115); and one independent repair shop allegedly "devised" a cheap fix to a Tesla battery issue (*id.* ¶ 116). Plaintiff alleges no specific facts concerning, for example, how many "maintenance-related parts" are available from third parties, or how many third-party repairers have "devised" or "engineered" cheap fixes for repairing Tesla vehicles.[18] This lack of specificity is fatal to Plaintiff's monopolization claims and attempted monopolization claims. *See Terminalift LLC v. Int'l Longshore and Warehouse Union Local 29*, No. 11-1999, 2013 WL 2154793, at *6 (S.D. Cal. May 17, 2013) ("Because there is no allegation regarding [market shares], Terminalift has failed to plead facts suggesting a dangerous probability of success.").

Plaintiff also has not plausibly shown that the alleged aftermarkets are protected by high entry barriers, another key element of monopoly power. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 16-cv-06370, 2017 WL 4310767, at *9 (N.D. Cal. Sept. 28, 2017). Plaintiff asserts that the alleged aftermarkets are "impacted by complex regulatory and licensing requirements" (Compl. ¶ 51), but does not allege what regulations apply to independent repair shops, how they act as entry barriers, or how

---

[17] Lavely Decl. Ex. K (Tesla Service Subscription Information).

[18] The Complaint also does not even attempt to account for the market presence of the "network of Tesla-approved service centers." (Compl. ¶ 3.) It says nothing about how many such service centers exist and what is required to be "Tesla-approved." Plaintiff seems to group that "network" with Tesla's own repair shops when alleging Tesla's purported market power, but the law is clear that "market share of an [alleged] monopolizer and its competitors may be aggregated only where the [alleged] monopolizer controls the ersatz competitors to such a degree that all the entities should be considered a single firm for Sherman Act purposes." *Epicor Software Corp. v. Alt. Tech. Sols., Inc.*, No. 13-00448, 2013 WL 12130024, at *2 (C.D. Cal. Dec. 2, 2013).

1    being a shop that repairs Teslas differs from a regulatory or licensing perspective from the many shops

2    that service other cars. Plaintiff also says that the alleged parts aftermarket (but not the alleged services

3    aftermarket) requires "substantial capital investments" (*id.*), but does not explain what those investments

4    are, their magnitude, or how they would prevent entry or expansion by third-party parts suppliers. Such

5    "superficial[] references" to "high capital costs" are not enough. *Optronic*, 2017 WL 4310767, at *9.

6         Plaintiff also contends that Tesla's warranties and alleged aftermarket restrictions constitute

7    entry barriers. (Compl. ¶ 52.) Those allegations are insufficient as well. Plaintiff asserts that, as a result

8    of Tesla's warranties, a new entrant in the alleged aftermarkets would "effectively be limited to

9    competing for customers" no longer under warranty or "willing and able to risk voiding their vehicle

10   warranties." (*Id.*) Even if Tesla's warranties conditioned coverage on obtaining services or parts from

11   Tesla (which they do not), the Complaint does not explain how or why or to what extent that would

12   prevent entry into the alleged aftermarkets. For example, there is no plausible explanation as to how the

13   alleged conditional warranties prevent repair shops from effectively competing to provide Tesla repairs.

14   *See Optronic*, 2017 WL 4310767, at *9 ("Without a better description of the purported entry barriers"

15   such as "why [they are] so significant as to prevent new market entrants," "the allegations are too

16   conclusory to be entitled to an assumption of truth.").

17        Plaintiff asserts that independent repairers are prevented from entry because they purportedly

18   lack "reasonable access" to the repair resources Plaintiff claims are necessary to properly service and

19   maintain Tesla vehicles. (Compl. ¶ 52.) Here, also, the alleged barrier is too vague and conclusory. The

20   supposedly "unreasonable" terms of access are having to pay $3,000 per year for a subscription to

21   certain diagnostic software and having to "submit an application" to use Tesla's free parts catalog,

22   where some unspecified number of parts allegedly are unavailable. (Compl. ¶¶ 82-83.) The Complaint

23   does not explain how these alleged costs, requirements, and unavailability are "so significant as to

24   prevent" entry into the alleged aftermarkets. *Optronic*, 2017 WL 4310767, at *9. For all of these

25   reasons, Plaintiff's assertion that Tesla possesses monopoly power in the alleged aftermarkets, or a

26   dangerous probability of achieving it, falls flat. *See Eastman v. Quest Diagnostics, Inc.*, 108 F. Supp. 3d

27   827, 836 (N.D. Cal. 2015) (dismissing monopolization claim where plaintiffs failed to plausibly explain

28   how defendant maintained its market position or how competition fared in the relevant markets).

**B.      Plaintiff Has Not Plausibly Alleged Any Anticompetitive Conduct.**

Even if Plaintiff had adequately pleaded monopoly power in the alleged aftermarkets, not all monopolies are unlawful under Section 2 of the Sherman Act. In particular, Section 2 does not prohibit monopolies achieved through "growth or development that occurs as a consequence of a superior product, business acumen, or historic accident"; nor does it require "firms that acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers to share the source of their advantage." *Dreamstime.com*, 54 F.4th at 1137-38 (quotations omitted). Section 2 prohibits only those monopolies (or near-monopolies) achieved or maintained through "anticompetitive conduct," meaning "conduct that harms the competitive process as a whole" and engaged in "with an intent to control prices or exclude competition in the relevant market." *Id.* at 1137 (quotations omitted); *see Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398, 407 (2004) ("[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."). Section 2 "does not punish economic behavior that benefits consumers and will not cause long-run injury to the competitive process." *Dreamstime.com, LLC*, 54 F.4th at 1137. And firms have no antitrust duty to deal with rivals on the rivals' preferred terms. *See Qualcomm*, 969 F.3d at 993. Thus, to sustain Section 2 claims, Plaintiff must plead specific facts plausibly supporting the inference that Tesla engaged in anticompetitive conduct with the intent to control prices or exclude competition. Plaintiff fails to do so.

Plaintiff says that the following alleged conduct is anticompetitive: (1) Tesla's warranties and other policies "strongly discourage" covered Tesla owners from obtaining parts or services anywhere but Tesla; (2) Tesla designs its vehicles so that maintenance and repairs require access to remote diagnostics and over-the-air software available only to Tesla; and (3) Tesla limits access to certain information and parts. (Compl. ¶ 4.) As shown below, none of this alleged conduct supports a Section 2 claim. "Because each individual action alleged by [Plaintiff] does not rise to anticompetitive conduct in the relevant market, their collective sum likewise does not." *Dreamstime.com, LLC*, 54 F.4th at 1142.

*First*, Plaintiff's allegations concerning Tesla's warranties do not describe anticompetitive conduct. Plaintiff acknowledges that the policies themselves do not prevent Tesla owners from using third-party repair shops or parts. Rather, the warranties say only that coverage "may" be voided if

damage is caused by "improper" maintenance, service, or repairs. (Compl. ¶ 87.) There is no antitrust duty to extend warranty coverage to damages caused by improper service or repairs, and there is nothing anticompetitive about Tesla's warranty policies, especially where Tesla's *competitors* "impose similar restraints." (Compl. ¶ 31.) Plaintiff claims that, in practice, Tesla's warranties "strongly discourage" consumers from going anywhere but Tesla for parts and repairs. (Compl. ¶ 86.) That is also insufficient. Plaintiff's only examples are a handful of consumers complaining about Tesla service in online forums. Such one-off anecdotes do not come close to supporting an inference of exclusionary conduct resulting in monopolization of a nationwide market for all Tesla parts and services.[19] Nothing in Tesla's policy can be construed as "harm to the competitive process" under any plausible reading.[20] *See In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1032 (N.D. Cal. 2008); *Dreamstime.com*, 54 F.4th at 1138.

*Second*, Plaintiff contends that Tesla designs its vehicles so that only Tesla has access to remote diagnostics and over-the-air software updates. (Compl. ¶¶ 4, 78.) This conclusory allegation, even if true, does not constitute anticompetitive conduct. "[C]ourts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001). Equally, there is nothing in the antitrust laws that requires a firm to design its products in a way that gives rivals easier access to them. *Id.* (In technology-driven markets, "firms routinely innovate in the hope of appealing to consumers, sometimes in the process making their products incompatible with those of rivals.") Plaintiff alleges no facts indicating that Tesla designs its vehicles for the specific *purpose* of excluding competitors, as opposed to reasons concerning cyber-security, passenger safety, aesthetics, customer convenience or any other non-exclusionary

---

[19] *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1186 (9th Cir. 2016); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1203 (9th Cir. 2012) (affirming dismissal where plaintiffs "ha[d] not alleged in their complaint how competition (rather than consumers) is injured"). One of Plaintiff's anecdotes involves a Tesla owner who resides in Canada—outside Plaintiff's alleged geographic market. (Compl. ¶ 93 n.71.)

[20] Plaintiff's allegations regarding Tesla's "salvaged" (severely damaged) vehicle policy similarly fall well short of alleging exclusionary action. (Compl. ¶¶ 95-96.) Plaintiff does not even attempt to connect the policy to any anticompetitive effect, nor can he. Moreover, there are facially procompetitive reasons supporting the policy, such as avoiding risks to repair technicians. (*Id.* ¶ 95 n.72); *see Univ. Grading Serv. v. eBay, Inc.*, No. C-09-2755, 2012 WL 70644, at *6 (N.D. Cal. Jan. 9, 2012) ("With reasonable, pro-competitive justifications for the [policy] evident from the face of the complaint . . . , plaintiffs' claim cannot withstand scrutiny even on a motion to dismiss.").

1    purpose. Nor does Plaintiff allege any facts supporting the inference that the alleged design choices

2    actually excluded any rival in the alleged aftermarkets (or that rivals do things differently). There is

3    nothing anticompetitive about Tesla's vehicle design choices.

4         *Third*, Plaintiff's allegations concerning "limited access" to Tesla manuals, diagnostic software

5    subscriptions, and parts catalogs do not give rise to any inference of anticompetitive conduct. Plaintiff

6    does not and cannot plausibly explain how Tesla's practices—offering free access to service manuals,

7    offering free diagnostic software embedded into the vehicle touchscreen for most common repairs, or

8    charging a modest fee for a diagnostic software subscription for complicated repairs (which are

9    consistent with industry standards)—are anticompetitive. (Compl. ¶¶ 31, 82; Lavely Decl. Ex. K.) There

10   is no non-conclusory allegation indicating that these fees are or were unreasonable, inconsistent with

11   industry practice, not assessed to cover costs or, most importantly, exclusionary in any way. As noted

12   above, the Complaint alleges that competitors impose "similar restraints." There are no facts alleged to

13   support any inference that independent repair shops cannot afford the fee and still stay in the business of

14   servicing Tesla vehicles. *See Alaska Airlines, Inc. v. United Airlines*, *Inc.*, 948 F.2d 536, 545 (9th Cir.

15   1991) (finding no antitrust violation where access fee was not so high as to drive away competition).

16   Firms have no antitrust duty to "give away" their products. *Free Freehand Corp. v. Adobe Sys. Inc.*, 852

17   F. Supp. 2d 1171, 1184 (N.D. Cal. 2012); *see Aerotec*, 836 F.3d at 1184 ("Competitors are not required

18   to engage in a lovefest.").

19        Nor is there any plausible allegation of anticompetitive conduct relating to the supposed

20   unavailability of certain parts in the catalog. Plaintiff does not plead any facts suggesting that Tesla

21   intentionally made certain parts unavailable for the purpose of excluding rivals. Plaintiff does not

22   address the possibility that the unavailability of parts is due to cyber-security or safety concerns, supply

23   constraints, recalls, or any other of a range of non-exclusionary reasons. And there are no facts alleged

24   from which to infer that the purported unavailability of parts has excluded any rivals from the alleged

25   aftermarkets. Plaintiff says nothing about how many parts are unavailable, their importance to

26   competition, or how their supposed unavailability affects rivals' ability to compete in the alleged

27   aftermarkets. Those are all fatal omissions. Even setting those omissions aside, Tesla has no duty to

28   make every part available to its rivals. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438,

448 (2009) ("[B]usinesses are free to choose the parties with whom they will deal as well as the prices, terms and conditions of that dealing.").

Relatedly, Plaintiff alleges that Tesla "requir[es] at least some of its suppliers [of Tesla-compatible parts] to enter into *de facto* exclusivity agreements." (Compl. ¶ 98.) Even if true, that is not anticompetitive. The law recognizes that exclusive dealing often has large "economic benefits" to competition, and as a consequence such arrangements can violate the antitrust laws only if their "effect is to foreclose competition in a substantial share" of the relevant market. *Allied Orthopedic Aplliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 996 (9th Cir. 2010) (quotations omitted). Courts also look to factors such as the duration of the exclusive contract, since even substantial foreclosure for a short term duration is unlikely to harm the competitive process. *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-04689, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014).

Here, Plaintiff does not assert an exclusive dealing claim but nonetheless asks the court to infer that Tesla's allegedly "*de facto*" exclusive agreements have an anticompetitive effect supporting a claim of monopolization. But the Complaint identifies only one contract (a Tesla/Panasonic agreement filed with the SEC in 2014), and Plaintiff says nothing about what parts are even covered by that contract, much less the percent of the alleged aftermarket attributable to the covered part(s). There also are no allegations about the duration of the exclusivity, nor anything to indicate that the exclusivity actually foreclosed competitors in the alleged aftermarkets. There is simply nothing in the allegations enabling an inference of substantial market foreclosure relating to the alleged exclusivity, and therefore no basis to infer that the alleged exclusivity is anticompetitive.

## III. Plaintiff Does Not Plausibly Allege a Tying Claim Under Section 1 of the Sherman Act.

To adequately plead a tying claim under Section 1, a plaintiff must plausibly allege the existence of two separate products or services, that the defendant conditions the sale of the tying product upon the purchase of the tied product, and that the defendant has sufficient power in the market for the tying product to restrain trade in the tied product. *Aerotec*, 836 F.3d at 1178. Like the Section 2 claims, Plaintiff's Section 1 tying claim fails because Plaintiff has not plausibly alleged any relevant antitrust markets, which alone is grounds for dismissal. *Newcal*, 513 F.3d at 1044 n.3. Plaintiff's tying claim suffers from other defects, each of which warrants dismissal: (1) Plaintiff fails to plausibly allege the

1    existence of a tie; and (2) Plaintiff fails to allege market power in any of the alleged tying markets.

2        **A.    Plaintiff Has Not Plausibly Alleged a Tie.**

3        Plaintiff's Section 1 tying claim "falters on the first, most fundamental requirement—the

4    existence of a tie." *Aerotec*, 836 F.3d at 1178. "A tying arrangement is an agreement by a party to sell

5    one product but only on the condition that the buyer also purchases a different (or tied) product, or at

6    least agrees that he will not purchase that product from any other supplier." *Kodak*, 504 U.S. at 461-62

7    (citation and quotations omitted). "[W]hether there is a tie turns on whether the defendant gave buyers

8    the reasonable impression that it would not sell product A to those who would not buy its B." *Aerotec*,

9    836 F.3d at 1178 (quotations omitted). Of course, "where the buyer is free to take either product by

10   itself, there is no tying problem." *Dream Big Media Inc. v. Alphabet Inc.*, No. 22-CV-02314-JSW, 2022

11   WL 16579322, at *6 (N.D. Cal. Nov. 1, 2022).

12       Plaintiff asserts, with virtually no explanation, four different alleged tying arrangements:

13   (1) Tesla EVs (tying) and Tesla Repair Services (tied); (2) Tesla EVs (tying) and Tesla-Compatible

14   Parts (tied); (3) Tesla-Compatible Parts (tying) and Tesla Repair Services (tied); and (4) Tesla Repair

15   Services (tying) and Tesla-Compatible Parts (tied). (Compl. ¶¶ 167-69.) As discussed below, none of

16   these alleged arrangements "fit [the Section 1 tying] framework because there is no condition linked to a

17   sale" in any of them. *Aerotec*, 836 F.3d at 1178.

18       *First*, there is no tie. Plaintiff does not assert any plausible factual allegations to support the

19   inference of an express tie—one memorialized in the form of a contract requiring the consumer to buy

20   Product A in order to buy Product B. *Id.* at 1179. Plaintiff does not allege that Tesla's written policies

21   dictate that it will only sell Tesla parts or services if a consumer buys a Tesla EV, or vice versa, or that

22   the sale of Tesla parts or services is expressly conditioned on the purchase of one product or the other.

23   There is no allegation that Tesla conditions the sale of its EVs on consumers buying parts or services

24   only from Tesla. The absence of any such claim alone is grounds to reject the alleged ties with Tesla

25   vehicles as the tying product.

26       Plaintiff suggests that Tesla ties its vehicle warranty coverage (not its vehicles) to Tesla-supplied

27   parts and services. Plaintiff acknowledges, however, that Tesla's warranties "do not explicitly require

28   that all such services be performed" by Tesla and "do not expressly require owners to purchase parts or

                                                        20

service from their Tesla EVs only through Tesla's app." (Compl. ¶¶ 60, 86.) Thus, Plaintiff effectively admits there is no tie there either. *See Dream Big Media Inc.*, 2022 WL 16579322, at *3 (plaintiffs failed to allege a claim tying Google's mapping API service to any other Google product or service).

*Second*, Plaintiff does not plausibly allege facts that would constitute any *de facto* tie. *Aerotec*, 836 F.3d at 1179. Plaintiff asserts that Tesla "utilize[s] various methods to discourage consumers from maintaining and repairing their own purchased goods." (Compl. ¶ 61.) At the same time, however, Plaintiff acknowledges that Tesla has made a range of diagnostic and repair resources available to third parties. (*Id.* ¶¶ 82-83.) Such conflicting allegations provide no basis for a Section 1 tying claim.

Moreover, there are no allegations supporting the inference that Tesla imposes any of the following requirements on consumers (explicitly or implicitly): (i) buy parts and services from Tesla in order to buy a Tesla vehicle; (ii) buy parts from Tesla in order to buy services from Tesla; or (iii) buy services from Tesla in order to buy parts from Tesla. Absent plausible allegations of any such conditions, there can be no viable tying claim. *Aerotec*, 836 F.3d at 1180 ("The claim that Honeywell clogs and complicates the parts distribution pipeline to independent servicers cannot substitute for the necessary evidence of an implied condition embedded in the sale of the tying product."). The restrictions that Plaintiff alleges Tesla imposes on third-party repairers are insufficient. They are pleaded in wholly conclusory terms, and even as alleged, only "discourage" the use of competing products and services by purportedly making it less desirable for consumers to buy from those third parties. That is not enough. Nothing in Ninth Circuit tying precedent suggests that "arguably manipulative tactics imposed on a third-party competitor are sufficient by themselves to create a tie with respect to a separate buyer simply because they make it less desirable to purchase from the third party." *Aerotec*, 836 F.3d at 1180.

**B.    Plaintiff Has Not Plausibly Pleaded Market Power in the Alleged Tying Markets.**

Another essential element of any tying claim is that the defendant possesses market power in the alleged tying market. *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (finding that without market power in the tying market, there is no tying claim). In discerning whether a defendant has market power in the tying product, "the Court must focus on 'whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.'" *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1226

21

1   (C.D. Cal. 2012) (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969)).

2          Plaintiff fails to sufficiently plead that Tesla has market power in any of the alleged markets:

3   (1) none of the alleged tying markets are pleaded as a cognizable antitrust market (Section I); (2) the

4   allegations do not support a conclusion of market power (Section II.A); and (3) Plaintiff fails to identify

5   any plausible entry barriers (Section II.A). Therefore, Plaintiff's tying claim is not viable.

6          **C.      The Complaint Provides No Plausible Basis for *Per Se* or "Quick Look" Review of**

7                  **the Section 1 Claim.**

8          "There are two general categories of liability standards for Sherman Act claims": "[a] small

9   group of restraints are unreasonable *per se* because they always or almost always tend to restrict

10  competition and decrease output," whereas "most restraints . . . are subject to the Rule of Reason,"

11  which requires an in-depth showing that the defendant's conduct had an actual adverse effect on

12  competition in a relevant market. *Epic*, 67 F.4th at 974 (quotations omitted). A third standard, the "quick

13  look," applies in the limited circumstances where "an observer with even a rudimentary understanding

14  of economics could conclude that the arrangements in question would have an anticompetitive effect on

15  customers and markets." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir. 2011).

16         Plaintiff attempts to reduce his pleading obligations (and burden of proof) by asserting that the

17  Section 1 tying claim is subject to the *per se* or "quick look" standard of review. To be clear, no standard

18  of proof could save Plaintiff's deficient tying pleading. For a tying claim, all standards—rule of reason,

19  *per se*, and quick look—require a showing of (i) separate and distinct "tying" and "tied" markets, (ii) the

20  existence of a tie, and (iii) the defendant's market power in the tying market. *See Epic*, 67 F.4th at 996.

21  As shown above, Plaintiff has not plausibly alleged any of these elements.

22         That aside, the Complaint asserts no plausible basis for the *per se* rule or quick look standard. As

23  the Supreme Court has repeatedly affirmed, the *per se* rule applies "only after considerable experience

24  with business relationships shows that a restraint always or almost always tend to restrict competition

25  and decrease output." *Epic*, 559 F. Supp. 3d at 1044-45 (quotations and citation omitted); *see Sidibe v.

26  Sutter Health*, 4 F. Supp. 3d 1160, 1177 (N.D. Cal. 2013) (rule of reason is the "presumptive mode of

27  analysis in Section 1 cases (including tying claims)"). The "quick look" is similarly limited. *Safeway*,

28  651 F.3d at 1138. Plaintiff provides no basis for applying them here.

**IV.     Plaintiff's Sherman Act Claims are Economically Implausible.**

Plaintiff's Sherman Act claims should be dismissed for the additional reason that they are economically implausible. *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010) ("On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is plausible in light of basic economic principles."). The core of Plaintiff's claim is that Tesla monopolizes parts and repair markets for its vehicles, risking unhappy EV consumers and thereby harming its primary business (selling EVs) supposedly to control prices in aftermarkets that do not drive Tesla's profits. Plaintiff's theory seems to be that Tesla can mistreat customers without fear of lost vehicle sales because it is somehow insulated from competition within the automotive market. That is too divorced from common sense to withstand scrutiny.

**V.     Plaintiff Fails To State a Claim Under § 102 of the Magnuson-Moss Warranty Act.**

The Magnuson-Moss Warranty Act ("Magnuson-Moss") prohibits conditioning a warranty on the use of "any article or service" identified by "brand, trade, or corporate name." 15 U.S.C. § 2302(c). Plaintiff fails to state a claim under Magnuson-Moss for several reasons.

**A.     Plaintiff Fails To Satisfy Two Preconditions To Bringing a Magnuson-Moss Claim.**

*Failure To Exhaust Dispute Resolution Process*: Magnuson-Moss enables a warrantor to "establish an informal dispute settlement procedure," that a customer must exhaust prior to litigating. 15 U.S.C. § 2310(a)(3); *Maronyan v. Toyota Motor Sales, Inc.*, 658 F.3d 1038, 1039 (9th Cir. 2011) (Magnuson-Moss "imposes a prior-resort requirement on prospective consumer claimants seeking recovery in court"). Tesla's New Vehicle Limited Warranty (the "Warranty")[21] requires pre-litigation written notice during the warranty period and sets forth its dispute resolution process. (Warranty at 14.)[22] Under the Warranty, an owner must "first provide . . . written notification of any defects . . . within a reasonable time to allow Tesla an opportunity to make any needed repairs before . . . pursu[ing] any remedy under these laws." (*Id.*) Only after receiving a response can a customer take further action. (*Id.*) Plaintiff was required to "initially resort to such procedure." 15 U.S.C. § 2310(a)(3)(C). He failed

---

[21] Plaintiff does not identify the applicable Tesla warranty, which alone requires dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Because Plaintiff cites the 2021 New Vehicle Limited Warranty (Compl ¶ 87), Tesla relies on its terms here. *See* Lavely Decl. Ex. H.

[22] The same was true of Tesla's prior 2015 and 2018 warranties. *See* Lavely Decl. Exs. I & J.

to do so, so his Magnuson-Moss claim must be dismissed.

_Failure To Identify 100 Named Plaintiffs_: Magnuson-Moss requires claims brought on behalf of a purported class to identify 100 named plaintiffs as a prerequisite to proceed as a class under the Act. 15 U.S.C. § 2310(d)(3)(B), (C); *see Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1034 (9th Cir. 2020). This Court has strictly enforced this requirement. *See*, *e.g.*, *Patterson v. RW Direct, Inc.*, No. 18-cv-00055-VC, 2018 WL 6106379, at *2 (N.D. Cal. 2018) (dismissing with prejudice a claim where a single named plaintiff filed suit on behalf of a class, because "[a] Magnuson-Moss claim is only cognizable on a class-wide basis" if there are 100 named plaintiffs). Even if ultimately consolidated, the complaints identify at most six named plaintiffs (Compl. ¶ 176), falling far short of this statutory requirement. This defect is fatal to Plaintiff's Magnuson-Moss claim.

**B.     Plaintiff Has Not Plausibly Alleged that Tesla's Warranty Violates the Statute.**

Plaintiff contends that Tesla violated 15 U.S.C. § 2302(c), which prohibits a warranty conditioned on a consumer's use of a particular brand of product or service. But Plaintiff concedes Tesla does not "condition" its warranty: "Tesla's warranties do not expressly require that Tesla EV owners utilize only Tesla Repair Services or Tesla-Compatible Parts purchased from Tesla." (Compl. ¶ 180.) Plaintiff instead argues that Tesla's warranty contains an unlawful "implicit requirement" by "strongly recommend[ing]" that consumers use Tesla parts and repair services. (*Id.*) But that is not the law, and the regulation Plaintiff cites undermines his claim. (*Id.* ¶¶ 178-79.) While Tesla "does not cover any vehicle damage or malfunction" caused by "[f]ailure to take the vehicle to . . . a Tesla Service Center or Tesla authorized repair facility upon discovery of a defect covered by this [Warranty]" and limits coverage for instances of "improper repair or maintenance" or damage resulting from "the installation or use of non-genuine Tesla parts or accessories" (Warranty at 9-10), this limitation is entirely appropriate under Magnuson-Moss. The regulation states that a warrantor may "expressly exclud[e] liability for defects or damage caused by 'unauthorized' articles or service . . . [or] deny[] liability where the warrantor can demonstrate that the defect or damage was so caused." 16 C.F.R. § 700.10(c). The Warranty is entirely legal, and the Magnuson-Moss claim should be dismissed.

**VI.     Plaintiff Has Not Adequately Pleaded Article III Standing.**

Article III "requires federal courts to satisfy themselves that the plaintiff has alleged such a

1   personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court

2   jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quotations omitted). Plaintiff

3   was thus required to show "(i) that he suffered an injury in fact that is concrete, particularized, and

4   actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would

5   likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

6          Plaintiff's Sherman Act claims require particularized, concrete allegations of harm caused by his

7   purchase of Tesla parts and services outside the warranty periods. *See Gerling v. Amazon.com Inc.*, 526

8   F.3d 1253, 1256 (9th Cir. 2008) (no standing where plaintiff did not "show or even allege that he

9   himself experienced" the injury). Plaintiff's theory is that Tesla's anticompetitive conduct caused him to

10  pay inflated prices for parts and services outside of his warranty. But Plaintiff alleges only that he "owns

11  a Tesla Model S and has paid Tesla for Tesla Repair Services and/or Tesla-Compatible Parts during the

12  Class Period." (Compl. ¶ 9.) "[S]tanding is not dispensed in gross," and thus "a plaintiff must

13  demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332,

14  352-53 (2006). Plaintiff cannot meet that standard by stating that he purchased "Tesla Repair Services

15  *and/or* Tesla-Compatible Parts." (Compl. ¶ 9) (emphasis added). Because he asserts separate claims for

16  alleged parts and services aftermarkets, Plaintiff was required to allege that he purchased *both* parts and

17  repair services from Tesla outside of the warranty. *See Summers*, 555 U.S. at 493; *DaimlerChrysler*, 547

18  U.S. at 352-53. His showing falls far short, and the Sherman Act claims must be dismissed.

19         Plaintiff's Magnuson-Moss claim requires him to have paid for Tesla parts or services *during* the

20  warranty period. Thus, Plaintiff was required to allege that he was party to a warranty that contained an

21  unlawful condition, faced car trouble during the warranty period, and, out of fear of voiding the

22  warranty, used Tesla parts/services when he would not otherwise have, causing him to pay inflated

23  prices. *See California v. Texas*, 141 S. Ct. 2104, 2119 (2021) (when standing theory "rests on a highly

24  attenuated chain of possibilities," "far stronger evidence" is required to establish traceability). Plaintiff

25  failed to do so. His Magnuson-Moss claim therefore must be dismissed for lack of Article III standing.

26                                  **CONCLUSION**

27         For the foregoing reasons, the Complaint should be dismissed with prejudice.

28

1   Dated: June 9, 2023

2

3                                              Respectfully Submitted,

4

5                            By:    */s/ Vanessa A. Lavely*
                                    David R. Marriott (SBN 2682565)
6                                   Noah Joshua Phillips (*pro hac vice*)
                                    Vanessa A. Lavely (*pro hac vice*)
7                                   **CRAVATH, SWAINE & MOORE LLP**

8                                   *Counsel for Defendant Tesla, Inc.*

9                                   Christopher C. Wheeler (SBN 224872)
                                    **FARELLA BRAUN + MARTEL LLP**
10                                  One Bush Street, Suite 900
                                    San Francisco, California 94104
11                                  Telephone:  (415) 954-4979
                                    Facsimile:  (415) 954 4480
12

13                                  *Counsel for Defendant Tesla, Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28